# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Peakspeed, Inc.<br><br>      Plaintiff,<br><br>v.<br><br>Timothy Emerson,<br><br>      Defendant. | Civil File No. 0:20-cv-01630-JRT-BRT<br><br>**Defendant's Opposition to Peakspeed's Motion for Preliminary Injunction** |

# TABLE OF CONTENTS

I.    ISSUE PRESENTED AND INTRODUCTION..............................................................1

II.   PERTINENT FACTS...................................................................................................2

    A. EmersonAI owns the registered copyright for TrueView. ...................................2

    B. It is undisputed that Timothy Emerson authored TrueView before
       Peakspeed was incorporated on January 31, 2020...............................................3

    C. It is undisputed that there are no written agreements between Timothy
       Emerson and Peakspeed........................................................................................6

    D. Peakspeed is a shell company with no assets, no intellectual property, and
       no employees........................................................................................................9

III.  ARGUMENT................................................................................................................14

    A. Legal standard for a preliminary injunction.......................................................14

    B. First, Peakspeed is not entitled to a preliminary injunction because it
       cannot show that it will likely succeed on the merits of any claim....................16

          1. Peakspeed cannot demonstrate that it will likely succeed in its
             claim to own the TrueView copyright because Tim Emerson
             authored TrueView before Peakspeed existed..........................................16

          2. Peakspeed cannot show that it is likely to succeed on its Computer
             Fraud and Abuse Act claim because Tim is accused of revoking
             Peakspeed's access to an AWS account and HP servers that Tim
             undisputedly owns.....................................................................................24

          3. Peakspeed's conversion claim fails because Peakspeed has not
             proved that it owns the AWS account or that the allegedly stolen
             $20,000 credit ever existed. ...................................................................29

    C. Second, Peakspeed's Motion for Preliminary Injunction should also be
       denied because Peakspeed has failed to show irreparable harm.........................30

    D. Third, the Court should deny Peakspeed's Motion because the balance
       of harms weigh heavily against a preliminary injunction since an
       injunction would put EmersonAI out of business.................................................35

E. Finally, the Court should strike paragraphs 15 and 17 of David Eaton's declaration under Rule 602 because he lacks personal knowledge of those matters. ................................................................................... 36

IV.   Conclusion ........................................................................................ 39

## Table of Authorities

### Cases

*Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*,
   No. 16-cv-2671, 2016 WL 4472943 (D. Minn. Aug. 24, 2016) (Doty, J.) ........... 31, 32, 34

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*,
   640 F.2d 109 (8th Cir. 1981) (en banc) ........................................................................15

*Gen. Motors Corp. v. Harry Brown's, LLC*,
   563 F.3d 312 (8th Cir. 2009)..................................................................................... 30

*Home Instead, Inc. v. Florance*,
   721 F.3d 494 (8th Cir. 2013)........................................................................................15

*Integrated Process Sols., Inc. v. Lanix LLC*,
   No. 19-cv-567, 2019 WL 1238835 (D. Minn. Mar. 18, 2019) (Brasel, J.) ...................... 25

*Iowa Utils. Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) .......................................................................................31

*Kirk v. Harter*,
   188 F.3d 1005 (8th Cir. 1999) .................................................................................... 14

*Lankford v. Sherman*,
   451 F.3d 496 (8th Cir. 2006) ................................................................................. 14, 15

*Mainstream Fashions Franchising, Inc. v. All These Things, LLC*,
   453 F. Supp. 3d 1167 (D. Minn. 2020) (Nelson, J.) ...................................................... 33

*Midwest Sign & Screen Printing Supply Co. v. Dalpe*,
   386 F. Supp. 3d 1037 (D. Minn. 2019) (Tostrud, J.) ..................................................... 16

*Minn. RFL Republican Farmer Labor Caucus v. Freeman*,
   No. 19-cv-1949, 2020 WL 5512509 (D. Minn. Sep. 14, 2020) (Tostrud, J.).............30, 31

*Mulcahy v. Cheetah Learning LLC*,
   386 F.3d 849 (8th Cir. 2004)................................................................... 22, 23, 24

*My Pillow, Inc. v. Ontel Prod. Corp.*,
   No. 19-cv-903, 2020 WL 1977287 (D. Minn. Apr. 3, 2020) (Bowbeer, Mag.) ...............15

*NewLeaf Designs, LLC v. BestBins Corp.*,
   168 F. Supp. 2d 1039 (D. Minn. 2001) (Tunheim, J.) ........................................ 33, 34, 35

*Novus Franchising, Inc. v. Dawson*,
   725 F.3d 885 (8th Cir. 2013)...............................................................................15, 33

*Oliver v. Johanson*,
   357 F. Supp. 3d 758 (W.D. Ark. 2018)....................................................................... 14, 20

*Thimbleberries, Inc. v. C & F Ents. Inc.*,
   142 F. Supp. 2d 1132 (D. Minn. 2001) (Doty, J.) ............................................................ 18

*Tri-State Grease & Tallow Co. v. Milk Specialities Co*,
   No. 11-cv-709, 2011 WL 1561674 (D. Minn. Apr. 22, 2011) (Kyle, J.) .....................31, 32

*United States v. Middleton*,
   231 F.3d 1207, 1209 (9th Cir. 2000) ................................................................................. 25

*W. Publ'g Co. v. Mead Data Cent., Inc.*,
   799 F.2d 1219 (8th Cir. 1986) ...........................................................................................15

*Weg Elec. Corp v. Pethers*,
   No. 16-cv-471, 2016 WL 1441793 (D. Minn. Apr. 12, 2016) (Doty, J.) ......................... 34

*Woods v. Resnick*,
   725 F. Supp. 2d 809 (W.D. Wis. 2010) ........................................................................... 20

## STATUTES

17 U.S.C. § 101 ....................................................................................................................... 23

17 U.S.C. § 106 ....................................................................................................................... 21

17 U.S.C. § 201 ....................................................................................................................... 19

17 U.S.C. § 204 ....................................................................................................................... 19

## RULES

FED. R. EVID. 602 ............................................................................................................. 36, 38

FED. R. EVID. 802 ............................................................................................................. 26, 38

# I. Issue Presented and Introduction

The only issue facing the Court boils down to the following straightforward question:

> Under the Copyright Act, the only relevant ways one can become the owner of a copyright is by original authorship or a written transfer signed by the owner. Here, it is undisputed that Timothy Emerson authored TrueView for EmersonAI before Peakspeed existed. EmersonAI subsequently applied for and received the registered copyright for TrueView. And there are no written agreements whatsoever between EmersonAI/Tim and Peakspeed. Under these circumstances, does Peakspeed have any valid claim to ownership of the TrueView copyright?

This is the overarching question that effectively subsumes all other issues.

So why are we here? Timothy Emerson ("Tim") is at heart an inventor, engineer, and programmer. So Tim decided to partner with David and Dan Eaton, who are business and sales professionals, so that they could handle the marketing and selling of TrueView, allowing Tim to continue to tinker, invent, and build new applications. To accomplish this, they decided to create a new company—Peakspeed—that would be an equal partnership (1/3 each) between David, Dan, and Tim and would focus on marketing and selling TrueView as well as anything else that Tim came up with.

David Eaton, who was perceived as the most experienced businessman, was tasked by the three prospective partners with making Peakspeed into a legal reality, which included incorporating Peakspeed and s putting into

place all the written agreements and contracts necessary. But David Eaton never completed his task. As a result, when Tim was forced out of Peakspeed on July 6, 2020,[1] Peakspeed was still nothing more than a shell company with no assets, no intellectual property, and no employees.

Accordingly, Peakspeed's motion should be denied in its entirety.

## II. Pertinent Facts

### A. EmersonAI owns the registered copyright for TrueView.

On July 8, 2020, EmersonAI submitted its application to register the copyright for the TrueView source code.[2] The Copyright Office granted the registration that same day.[3]



---

[1] Dkt. 25-12; Dkt. 24: Emerson Decl. at ¶¶ 107-109.
[2] Ex. 7.
[3] *Id.*

Under 17 U.S.C. § 410, this registered copyright is "prima facia evidence of the validity of the copyright and the facts stated in the certificate." So there is a statutory presumption that EmersonAI owns the TrueView copyright.

## B. It is undisputed that Timothy Emerson authored TrueView before Peakspeed was incorporated on January 31, 2020.

It is important to define what TrueView is and is not. Tim defines TrueView as a combination of the host processing code that runs on the CPU and the code that runs on the FPGA.[4]

All of Tim's work on TrueView was done under his consulting company, Emerson Consulting LLC, which invoiced EmersonAI for its services, and was paid by EmersonAI via direct payments from EmersonAI's Wells Fargo business account.[5] And from time to time, Tim took an ownership draw from Emerson Consulting.[6]

Tim's consulting arrangement with EmersonAI started in April 2019 and continued through July 2020.[7] But the last payment Emerson

---

[4] Deposition of Timothy Emerson on Sept. 14, 2020 (hereinafter "Ex.1: Emerson Depo.") at 24:6-21. Citations to Ex. in this brief will refer to the Exhibits filed simultaneously with this brief.
[5] Ex.1: Emerson Depo. at 86:22-88:17, 93:2-95:5; Dkt. 24: Emerson Decl. at ¶ 113; Dkt. 25-1; Dkt. 25-5 at 4 of 8; Deposition of David Eaton on Sept. 9, 2020 (hereinafter "Ex. 2: Eaton Depo.") at 73:3-16, 76:12-78:15.
[6] Emerson Depo. at 88:2-23.
[7] Emerson Depo. at 93:2-94:14; Dkt. 25-1; Dkt. 25-5 at 4 of 8.

Consulting received was on February 26, 2020 for Invoice # 121 that covered work performed between February 3 and February 14, 2020.[8] Other than these payments from EmersonAI to Emerson consulting, Tim received no compensation for his work on TrueView in either 2019 or 2020.[9]

By the end of 2019, TrueView was in an alpha stage of development and was ready to be demonstrated to customers.[10] Tim wrote nearly the entirety of this version of TrueView's source code.[11] At this point, TrueView was capable of running on various Xilinx FPGA products and the Amazon Web Services ("AWS") F1 instance.[12] So in December 2019, Tim began the process to register EmersonAI in the AWS Marketplace to begin selling TrueView.[13] All this work predates existence of Peakspeed, which was not incorporated until January 31, 2020.[14]

---

[8] Dkt. 25-1 at 22 of 31 (Invoice #121); Dkt. 25-5 at 4 of 8; Ex. 1 Emerson Depo. at 94:10-14; Ex. 2: Eaton Depo. at 56:1-8, 64:19-65:4, 152:20-153:2, 160:18-161:19.

[9] Ex. 1: Emerson Depo. at 107:11-108:7; Ex. 2: Eaton Depo. at 56:1-8, 59:12-66:20, 73:3-16, 75:23-78:15, 160:21-161:19; Dkt. 24: Emerson Decl. ¶¶ 9-11, 29; Dkt. 25-1; Dkt. 25-5.

[10] Ex.1: Emerson Depo. at 52:10-25; *see also* Dkt. 24: Emerson Decl. at ¶¶ 8-68 (explaining the founding of EmersonAI and his creation of TrueView).

[11] Ex. 1: Emerson Depo. at 97:5-100:19.

[12] Ex. 3 ("Was finally able to get the TrueView app to run on AWS…").

[13] Ex. 4.

[14] Ex. 5.

— 4 —

| File Number: | 7828712 | Incorporation Date / Formation Date: | 1/31/2020 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | PEAKSPEED, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | State: |
| Status: | Good Standing | Status Date: | 1/31/2020 |

This is confirmed by an EmersonAI Sales and Marketing Plan Gantt chart created by David Eaton in November 2019 that lists the TrueView source code for the Xilinx U250 and AWS F1 instance as 100% complete:[15]

## EmersonAI Sales and Marketing Plan

| | | | | | | |
|---|---|---|---|---|---|---|
| PROJECT TITLE | | CEO | | | | |
| PROJECT MANAGER | | Dave Eaton | | | | |

| WBS NUMBER | | TASK TITLE | TASK OWNER | START DATE | DUE DATE | DURATION | PCT OF TASK COMPLETE |
|---|---|---|---|---|---|---|---|
| 1 | Priority | Products | | | | | |
| 1.1 | - | TrueView on U250 | Tim E. | 11/1/19 | 11/1/19 | 0 | 100% |
| 1.2 | - | TrueView on AWS F1 | Tim E. | 11/1/19 | 11/1/19 | 0 | 100% |

In 2020, the TrueView source code Tim wrote in 2019 was "melded into the version of TrueView that exists today."[16] And the majority of the work on TrueView in 2020 was simply "reorganizing and adding better documentation into the code base that Tim" wrote and fixing "four major flaws in the software that would introduce errors into the image."[17] So the

---

[15] Ex. 10.
[16] Ex. 2: Eaton Depo. at 242:12-23.
[17] *Id.* at 243:7-245:11.

only difference in the TrueView source code that existed at the end of 2019 to the version of TrueView that existed on July 1, 2020 was the addition of one feature and some bug fixes.[18] In other words, the TrueView source code in July 2020 was "pretty much in the same shape as the end of 2019."[19]

## C. It is undisputed that there are no written agreements between Timothy Emerson and Peakspeed.

David Eaton testified at his deposition that there are no written agreements between Tim Emerson and Peakspeed:[20]

```
 8        Q.   Does Peakspeed have an employment agreement
 9   with Mr. Emerson?
10        A.   No.
11        Q.   Does Peakspeed have any written agreement at
12   all with Mr. Emerson?
13        A.   No.
```

And that Tim never assigned the TrueView source code to Peakspeed:[21]

```
17        Q.   Did -- did Tim Emerson ever assign the TrueView
18   source code that was written by him at EmersonAI to
19   Peakspeed?
20             MR. ZAYED:  Object to form.
21        A.   There was no formal intellectual property
22   transaction needed or executed when Tim joined Peakspeed.
23   BY MR. EVANS:
24        Q.   Is that a no?
25        A.   No, there is no --
```

---

[18] Ex. 1: Emerson Depo. at 101:24-102:8
[19] *Id.*
[20] Ex. 2: Eaton Depo. at 54:8-13.
[21] *Id.* at 52:17-53:3.

```
 2        A.   -- there was no agreement related to
 3   intellectual property between Tim Emerson and Peakspeed.
```

Instead, David Eaton testified that he believes that for Tim to retain ownership of any pre-existing intellectual property he would need an agreement stating that it would not become Peakspeed's property when Peakspeed was incorporated:[22]

```
 9        Q.   How do you know if a written agreement is
10   necessary or not?
11        A.   Let's imagine that when Tim was joining
12   Peakspeed as the CTO, that Tim said, I'm willing to come
13   to work for the company, but I'm not willing to bring
14   forward any of my past work on TrueView, so I would like
15   to hold that out as separate intellectual property.
16              Then there would have been a requirement
17   for some kind of legal document describing Emerson's
18   intellectual property that was not going to become part
19   of Peakspeed, but that never happened.
```

And Peakspeed confirmed in verified interrogatory responses that its only argument that it owns the TrueView copyright is based on its unfulfilled,[23] oral promise to give Tim a 33% ownership stake in Peakspeed:[24]

---

[22] *Id.* at 218:9-19.

[23] Ex. 2: Eaton Depo. at 161:14-19 (As of July 1, 2020, "[n]one of the employees, including Tim Emerson, had received shares in [Peakspeed].").

[24] Ex. 8: Peakspeed's Responses and Objections to Defendants First Set of Interrogatories at 10.

**Interrogatory No. 7:** Explain why Peakspeed believes it owns the TrueView source code and identify all documents or evidence that supports that claim.

Peakspeed was formed pursuant to an agreement between David Eaton, Tim Emerson and Dan Eaton as follows:

- In exchange for a future stock transfer of 33% each, Defendant and Dan Eaton, as co-owners of EmersonAI, contributed EmersonAI's assets—including source code and any intellectual property rights—to Peakspeed;

- In exchange for capital contributions—both the bridge loan of $25,000 to EmersonAI and the capital contributions to Peakspeed after its formation—, founding PeakSpeed and Serving as its CEO, David Emerson would receive a 33% ownership interest in Peakspeed;

- In exchange for his work as CTO of Peakspeed, Defendant would receive a salary and reimbursement for healthcare benefits.

All of the work done and intellectual property created by Peakspeed's employees—including Defendant (who along with all other employees was being paid a salary by David Eaton)—and agents working for Peakspeed is property of Peakspeed. This includes all source code written and developed for Peakspeed's use or contributed to Peakspeed in exchange for ownership shares in Peakspeed. None of Peakspeed's employees, including Defendant, had any agreements with Peakspeed that would exclude such intellectual property from Peakspeed's ownership. In fact, all of Peakspeed's

At his deposition, Tim testified that he never contributed any intellectual property or other assets to Peakspeed because he would not do so without a written agreement:[25]

_____

[25] Ex. 1: Emerson Depo. at 80:7-14.

— 8 —

```
 7              Q.   Did you contribute any assets to
 8    Peakspeed?
 9              A.   No.  No.  Not without any agreements I
10    wasn't going to contribute any to Peakspeed.  That's
11    why I kept pushing Dave.  I thought when the Peakspeed
12    name went down and he had the C corp that by the end of
13    February, it would be a done deal, and I was moving on
14    good faith.
```

## D. Peakspeed is a shell company with no assets, no intellectual property, and no employees.

As mentioned in our introduction, Peakspeed was intended to be an equal partnership between David Eaton, Dan Eaton, and Tim whose purpose was marketing and selling the TrueView application that Tim authored for EmersonAI.[26]

Tim was going to be CTO of Peakspeed and would grant Peakspeed an exclusive license to TrueView and IdentifAI.[27]

David Eaton was going to be the CEO of Peakspeed and was responsible for incorporating Peakspeed and putting all the necessary written agreements into place.[28] But he never did.[29] The only thing David Eaton

---

[26] Dkt. 24: Emerson Decl. ¶¶ 68-70; Ex. 8 at 5-7, 10-11, 15.

[27] Ex. 1: Emerson Depo. at 117:16-118:5. IdentifAI is another program Tim wrote before Peakspeed existed. This brief does not focus on IdentifAI because Plaintiff's motion purports to only seeks a declaration that Peakspeed owns the copyright to TrueView.

[28] Ex. 1 Emerson Depo. at 117:16-118:5, 142:3-15, 223:10-225:2.

[29] *Id.* at 142:3-15.

accomplished was incorporating Peakspeed on January 31, 2020.[30]

Because of David's failure to put any agreements into place, EmersonAI continued to be the operating company up until July 2020 but Tim allowed EmersonAI to begin doing business as ("DBA") Peakspeed starting in February 2020 to facilitate an eventual transition to Peakspeed:[31]

```
10            Q.   I'm going to go a little bit backwards
11   in time to January, February, and March of 2020.  What
12   was your mindset about Peakspeed at that time?
13            A.   My mindset was that I have to do
14   everything in my power to get this transition done from
15   EmersonAI to Peakspeed.  So I did not want to be the
16   obstacle.  I gave full access to the source code to
17   help the transition from EmersonAI to Peakspeed.
18                 I thought about it as really -- and I
19   communicated with other companies as we were doing the
20   transition -- that we were in a transmission --
21   transition, and it's going to take a while.  Please
22   bear with us in this transition, basically.  And it
23   really was a "EmersonAI doing business as Peakspeed"
24   mindset that I was working on.  In good faith,
25   basically saying, hey, EmersonAI is doing business as
1    Peakspeed until the time where we make it official, and
2    we have all the documents signed.
3                 So I was doing everything to speed that
4    process along.  That was my mindset.  I didn't ever
5    expect it to come back and bite me like this.
```

---

[30] Ex. 5.

[31] Ex. 1: Emerson Depo. at 223:10-225:2.

Accordingly, Emerson Consulting, Oscar Kramer, Joe Greshik, Matthew Baldin, Patrick Losique, and David Zimmerman continued to invoice and be paid by EmersonAI (from its Wells Fargo business checking account) for their work until June 2020.[32] And EmersonAI continued to pay for the various software accounts and licenses that were needed, such as the AWS account.[33] EmersonAI also provided all the computers and servers that were used by everyone that worked on TrueView.[34]

As a result, Tim was never an employee of Peakspeed. All of Tim's work on TrueView was done under his consulting company, Emerson Consulting LLC (which invoiced EmersonAI),[35] Emerson Consulting was paid by EmersonAI via direct deposit from EmersonAI's Wells Fargo business account,[36] Tim bought his own health insurance,[37] and the last payment Emerson Consulting received from EmersonAI was on February 26, 2020 for Invoice # 121 that covered work performed between February 3 and

---

[32] Dkt. 25-1 (Emerson Consulting Invoices); Dkt. 25-5 (Payments from EmersonAI bank account to Emerson Consulting, Oscar Kramer, David Zimmerman); Dkt. 25-8 (Matthew Baldin's Invoices); Dkt. 25-9 ( Joe Greshik's Invoices); Ex.1: Emerson Depo. at 86:22-87:13, 93:2-95:5; Dkt. 24: Emerson Decl. at ¶ 113; Ex. 2: Eaton Depo. at 73:3-16, 76:12-19.
[33] Ex. 1: Emerson Depo. at 88:24-89:6; Ex. 9.
[34] Ex. 2: Eaton Depo. at 202:17-203:6, 204:17-205:17
[35] Dkt. 25-1.
[36] Ex.1: Emerson Depo. at 86:22-87:13, 93:2-95:5; Dkt. 24: Emerson Decl. at ¶ 113; Ex. 2: Eaton Depo. at 73:3-16, 76:12-19, 160:18-161:19; Dkt. 25-5 at 4 of 8 (Payments from EmersonAI's Wells Fargo business account).
[37] Ex. 1: Emerson Depo. at 107:21-108:6.

February 14, 2020.[38] David Eaton admitted in his deposition that (i) there was no employment (or any other) agreement with Tim, (ii) Tim was a 1099 contractor, and (iii) Emerson Consulting invoiced EmersonAI and those invoices were paid via a direct deposit from EmersonAI's bank account: [39]

```
 9         Q.   And that's after Peakspeed was formed, right?
10         A.   Right.
11         Q.   And that's from Emerson Consulting, LLC.
12              Do you see that?
13         A.   Yes, I see that.
14         Q.   And that's billed to EmersonAI, LLC.
15              Do you see that?
16         A.   Right.
17         Q.   Did you pay this invoice?
18         A.   Yes, I paid invoices because Tim said that's
19    the way he would like to get his compensation.  And so
20    the other people were getting paid as contractors, and
21    that seemed very consistent.
```

Finally, Tim considered himself a partner, not an employee, at Peakspeed since he was supposed to be an equal partner with David and Dan Eaton:[40]

---

[38] Dkt. 25-1 at 22 of 31 (Invoice #121); Dkt. 25-5 at 4 of 8; Ex. 1: Emerson Depo. at 94:10-14; Ex.2: Eaton Depo. at 56:1-8, 64:19-65:4, 152:20-153:2, 160:18-161:19.

[39] Ex. 2: Eaton Depo. at 54:8-13 (no agreements between Tim and Peakspeed), 65:6-66:20, 73:3-16, 75:23-77:21, 194:20-22 ("We have no W-2 employees at Peakspeed. They're all 1099s.").

[40] Ex. 1: Emerson Depo. at 140:2-141:19.

```
10              Dave Eaton belittled me two or three
11   times in front of my EmersonAI team in regard to being
12   an employee, and I never responded back in those
13   emails.  I talked to him directly and said, "Dave, I'm
14   not an employee of Peakspeed."
15              I was very clear.  I said, "I'm not an
16   employee of Peakspeed.  We are going to be partners in
17   Peakspeed."
18              And he said, "No, that can't happen."  I
19   said, "That's the only way it's going to happen."  I
20   said, "I'm not going to be your employee.  I'm going to
21   be a partner with you in Peakspeed."
22              And so we had a disagreement on
23   whether -- he saw me as an employee.  I saw myself as a
24   partner.  We each owned a third of Peakspeed.  That's
25   why I thought myself as a partner.  And he wanted to
```

Unfortunately, Tim never received his promised shares in Peakspeed.[41] And other than the payments from EmersonAI to Emerson Consulting, Tim received no other compensation for his work on TrueView in either 2019 or 2020.[42]

These facts establish that Tim was working as an independent contractor. As the Eighth Circuit has noted, the failure to provide employment benefits or withhold payroll taxes is especially significant and

---

[41] Ex. 2: Eaton Depo. at 161:14-19 ("None of the employees, including Tim Emerson, had received shares in the company [as of July 1, 2020].").
[42] Ex. 1: Emerson Depo. at 107:11-108:7; Ex. 2: Eaton Depo. at 59:12-60:25, 62:25-63:24, 64:19-66:20, 73:3-16, 75:23-78:15, 160:18-161:19; Emerson Decl. ¶¶ 9-11, 29; Dkt. 25-1; Dkt. 25-5.

highly probative of one's status as an independent contractor. *Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir. 1999) (holding that a failure to treat someone "as an employee for tax purposes and … not pay him traditional employee benefits" was highly indicative of independent contractor status); *Oliver v. Johanson*, 357 F. Supp. 3d 758, 777-78 (W.D. Ark. 2018) ("the failure … to provide employment benefits or withhold any payroll taxes is especially significant and highly probative evidence of one's status as an independent contractor…").

### III.     ARGUMENT

Peakspeed's motion for preliminary injunction should be denied for three reasons. First, Peakspeed has not shown that it is likely to succeed on any of its claims. Second, Peakspeed has not demonstrated that it will suffer any irreparable harm in the absence of an injunction. Third, the balances of harm weigh heavily against granting Peakspeed an injunction because an injunction would put EmersonAI out of business. Finally, the Court should also strike paragraphs 15 and 17 of the Declaration of David Eaton (Dkt. 24) because Mr. Eaton admitted in his deposition that he lacks personal knowledge of the matters contained therein.

**A. Legal standard for a preliminary injunction.**

An injunction is an extraordinary remedy and the movant, Peakspeed, bears the burden of establishing the need for such relief. *Lankford v.*

*Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

In determining whether to grant a preliminary injunction under Rule 65(a), the Court considers the so-called "*Dataphase factors*": "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

Although the *Dataphase* factors are ordinarily balanced together, *W. Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), a movant's complete failure to show the first *Dataphase* factor—irreparable injury—is "an independently sufficient ground upon which to deny a preliminary injunction." *Novus Franchising*, 725 F.3d at 893.

Similarly, "[w]hile no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted); *see also My Pillow, Inc. v. Ontel Prod. Corp.*, No. 19-cv-903, 2020 WL 1977287, at *2 (D. Minn. Apr. 3, 2020) (Bowbeer, Mag.) ("Although no single factor is determinative, courts weigh heavily the likelihood of Plaintiff's success on the merits.").

— 15 —

So "the absence of a likelihood of success on the merits strongly

suggests that preliminary injunctive relief should be denied." *Midwest Sign*

*& Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1046 (D. Minn.

2019) (Tostrud, J) (cleaned up).

**B. First, Peakspeed is not entitled to a preliminary injunction because it cannot show that it will likely succeed on the merits of any claim.**

Peakspeed's motion for preliminary injunction should be denied because

Peakspeed cannot demonstrate that it is likely to succeed on the merits of

any of its claims.

First, Peakspeed cannot demonstrate that it owns the TrueView source

code because it is undisputed that Tim wrote the TrueView source code

before Peakspeed existed.

Second, Peakspeed cannot demonstrate a likelihood of success for its

Computer Fraud and Abuse Act because it is undisputed that Tim owns the

AWS account and servers that he is alleged to have improperly accessed.

Third, Peakspeed's conversion claim similarly fails because it cannot

establish that Peakspeed ever owned the $20,000 AWS credit it accuses

Tim of stealing, or that this credit ever existed.

**1. Peakspeed cannot demonstrate that it will likely succeed in its claim to own the TrueView copyright because Tim Emerson authored TrueView before Peakspeed existed.**

Peakspeed has failed to demonstrate that it will likely succeed in its claim

of ownership over the TrueView copyright because, despite bearing the burden of proof, Peakspeed offers *no evidence* to prove its ownership of the TrueView copyright. Instead, Peakspeed spends its entire brief arguing that (i) Emerson's contributions to the TrueView source code are not independently copyrightable, (ii) Emerson cannot be a co-owner because his contributions were a work for hire, and (iii) Emerson cannot lawfully stop Peakspeed's sale and use of TrueView.[43] In other words, Peakspeed's brief simply assumes that Peakspeed owns the copyright to TrueView without proving it.

But these arguments are beside the point. Peakspeed is seeking a declaration from the Court that it owns the TrueView source code copyright:[44]

> 1.   Peakspeed has established that it is likely to succeed in demonstrating that:
>    a.   Peakspeed is the owner of the copyright for the TrueView source code.
>    b.   Peakspeed has a right to use the TrueView source code without interference from Emerson.

To be successful in this claim, Peakspeed must demonstrate that "the material is original, that it can be copyrighted, and that all statutory

---

[43] Plaintiff's Memorandum of Law in Support of [*sic*] Motion for Preliminary Injunction (Dkt. 6) (hereafter "Pl. Memo ISO Prel. Inj.") at 10-20.
[44] Proposed Order Granting Plaintiff's Motion for Preliminary Injunction (Dkt. 8) at 1.

formalities have been complied with." *Thimbleberries, Inc. v. C & F Enterprises, Inc.*, 142 F. Supp. 2d 1132, 1137 (D. Minn. 2001) (Doty, J.). Yet Peakspeed failed to address any of these requirements in its brief.

Perhaps this is because three undisputed facts clearly demonstrate that EmersonAI owns the registered copyright to TrueView: (1) Tim authored the TrueView source code before Peakspeed existed,[45] (2) there are no written agreements between Peakspeed and Tim,[46] and (3) EmersonAI owns the registered copyright for TrueView.[47] The registered copyright creates a presumption that the TrueView copyright is valid and owned by EmersonAI. 17 U.S.C. § 410 ("In any judicial proceedings the certificate of a registration … shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").

By contrast, Peakspeed's primary argument for ownership of the TrueView copyright is contrary to the requirements of the Copyright Act.[48] Peakspeed claims that it owns TrueView because Tim agreed to contribute TrueView's source code to Peakspeed in exchange for 33% of Peakspeed's

---

[45] *Supra* § II(B).

[46] *Supra* § II(C).

[47] Ex. 7.

[48] Peakspeed did make this argument in its brief but this was its answer to Defendant's interrogatory that asked it to "Explain why Peakspeed believes it owns the TrueView source code and identify all documents and evidence that supports that claim." Ex. 8 at 9-10 (Interrogatory 7).

stock.[49] But under the Copyright Act, authorship of a copyright initially belongs to the author. 17 U.S.C. § 201(a). And the Copyright Act expressly provides that a transfer of copyright ownership is "not valid unless an instrument of conveyance… is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204. But Peakspeed's argument fails because TrueView was created by Tim for EmersonAI before Peakspeed was incorporated and there is no written instrument of conveyance to Peakspeed.

Accordingly, there simply is no legal support that the alleged promise of stock for source code could somehow alter these statutory requirements. In fact, the Western District of Arkansas recently considered and rejected exactly this argument:

> Defendants … contended that ownership of the DBCompensation software vested in the company for three separate reasons: (1) *Oliver contributed his software development work to the company in exchange for an ownership share in the company and generous disbursements since then*;
>
> …
>
> As the Court remarked then, *the first two arguments* advanced by Defendants as to why DB Squared owned the copyright to the DBCompensation software *appeared to be either directly contrary to the Copyright Act or at least arguably pre-empted by it.*

---

[49] *See* Ex. 8 at 4-6, 9-10.

*Oliver*, 357 F. Supp. 3d at 767 (emphasis added). Therefore, Peakspeed cannot demonstrate ownership of the TrueView copyright based on Tim's oral promise to contribute

"source code" to Peakspeed in exchange for a 33% ownership stake, especially since Tim *never received any shares* of Peakspeed.[50]

Next, Peakspeed argues that it owns the TrueView copyright because Tim's contributions were done as a work for hire.[51]

But the TrueView source code that Tim authored before Peakspeed existed cannot be a work for hire. *Oliver*, 357 F. Supp. 3d at 776 ("They certainly cannot be considered works for hire of the company DB Squared, because that LLC was not created until 2006, years after the first version of the software was created.").[52] Plus, Peakspeed's CEO admitted that EmersonAI owns the TrueView source code authored by Tim in 2019:[53]

---

[50] Ex. 2: Eaton Depo. at 161:14-19 ("None of the employees, including Tim Emerson, had received shares in the company [as of July 1, 2020].").
[51] Pl. Memo ISO Prel. Inj. at 17-19.
[52] *See also Woods v. Resnick*, 725 F. Supp. 2d 809, 825 (W.D. Wis. 2010) ("There is another reason why defendants' work-for-hire theory fails: F I Source, LLC did not exist at the time Woods prepared the source code.").
[53] Ex. 2: Eaton Depo. at 241:15-242:2.

```
15        Q.   Do you dispute that EmersonAI owns all the code
16   that was written by its employees in 2019?
17        A.   No.
18        Q.   So you're not -- Peakspeed is not asserting
19   ownership over any code that was written in 2019, then?
20                MR. ZAYED:  Object to form.
21        A.   Peakspeed is taking the position that all the
22   work that Tim did and the other people paid by Peakspeed
23   while they worked for Peakspeed, that all that work is
24   Peakspeed's property.
25                That's what we're claiming.  It's not --

 1   it's not claiming that it owns code that EmersonAI was
 2   working on in 2019.
```

Moreover, EmersonAI's registration of the TrueView source code copyright is prima facie evidence that it owns the copyright to TrueView.[54] 17 U.S.C. § 410(c).

Finally, EmersonAI's ownership of the copyright to the original TrueView source code[55] is fatal to Peakspeed's claim of ownership to any version of TrueView's source code because one of the exclusive rights conferred by the Copyright Act is the right to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Only EmersonAI had the right to iterate upon the original TrueView source code to create derivative works. And it is black letter law that "the creator of an original

---

[54] Ex. 7.
[55] This refers to code created before Peakspeed existed.

derivative work is only entitled to a copyright if [it] had permission to use the underlying copyrighted work." *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 (8th Cir. 2004).

The factual record establishes that the changes made to the TrueView source code in 2020 were derivative of the original TrueView source code. David Eaton admitted as much when he testified that the original TrueView source code "was melded into the version of TrueView that exists today":[56]

```
16            The code that Tim showed up with when he
17   came from EmersonAI to being paid by Peakspeed was an
18   incomplete product.  It was not functioning.  That's what
19   he brought.  That was what he was compensated for.
20            That code that he showed up with and the
21   code that Oscar showed up with was melded into the
22   version of TrueView that exists today through the effort
23   of all the Peakspeed employees.
```

And that development on TrueView in 2020 consisted of (1) reorganizing and adding documentation to the original TrueView source and (2) fixing four flaws.[57] Tim confirmed this when he testified that the only real differences in the TrueView source code from the end of 2019 to July 1, 2020 was the addition of one feature and some bug fixes:[58]

---

[56] Ex. 2: Eaton Depo. at 242:16-23.
[57] Ex. 2: Eaton Depo. at 243:21-244:20.
[58] Ex. 1: Emerson Depo. at 101:24-102:8.

```
24          Q.   How did the TrueView code change between
25    the end of 2019 and kind of mid-2020?

1           A.   It was -- the only thing was adding that
2     final component that really changed it.  Everything
3     else was just fixing bugs.  It was pretty much in the
4     same shape as the end of 2019.  Everything was just
5     fixing bugs and adding that one final component.  So
6     you had to define what were bugs and what were
7     features.  There was only one true feature that got put
8     in.
```

In Tim's words, the TrueView source code on July 1, 2020 was "pretty much in the same shape as the end of 2019."[59]

The Copyright Act defines a derivative work as "a work based upon one or more preexisting works." 17 U.S.C. § 101. Based on the factual record above, the TrueView source that existed in July 2020 is a derivative work because it merely iterated on the original TrueView source code.

As a result, Peakspeed cannot own the copyright to any derivative work of Trueview because it lacked permission from EmersonAI to use the original TrueView source code. According to the Eighth Circuit, "the creator of an original derivative work is only entitled to a copyright if [it] had permission to use the underlying copyrighted work." *Mulcahy*, 386 F.3d at 852. Peakspeed was never granted permission by EmersonAI to make

---

[59] Ex. 1: Emerson Depo. at 101:24-102:8.

derivative works of TrueView.

Furthermore, Peakspeed has not shown (or even tried to show) that any derivate TrueView source code is sufficiently original to even be eligible to be copyrighted. *Mulcahy*, 386 F.3d at 852 ("A derivative work may itself be copyrighted if it has the requisite originality.").

To summarize, the original TrueView source code was written by Tim for EmersonAI before Peakspeed existed. There are no written agreements conveying the TrueView copyright to Peakspeed. The version of TrueView that existed as of July 1, 2020 is clearly derivative of the original TrueView source code created before Peakspeed came into existence. And EmersonAI owns the registered copyright to TrueView and never granted Peakspeed permission to use it.

Therefore, Peakspeed has failed to demonstrate that it is likely to prevail on its claim that it owns the TrueView copyright.

**2. Peakspeed cannot show that it is likely to succeed on its Computer Fraud and Abuse Act claim because Tim is accused of revoking Peakspeed's access to an AWS account and HP servers that Tim undisputedly owns.**

Peakspeed's Computer Fraud and Abuse Act claim is similarly infirm because Tim (personally or through his wholly owned company, EmersonAI) owns both the servers and AWS account he is accused of improperly accessing.

Importantly, this Court interprets the Computer Fraud and Abuse Act narrowly to preclude liability for the misuse or misappropriation of confidential information stored on a computer that defendant has authority to access. *See Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-cv-567, 2019 WL 1238835, at *5-6 (D. Minn. Mar. 18, 2019) (Brasel, J.).

Here, Peakspeed accuses of Tim of exceeding "whatever authorization he had" "by locking Peakspeed employees out of" servers, changing the "copyright notices to the TrueView source code," and changing "the assignment of the AWS account."[60] But this claim fails because Peakspeed has not shown that it owns either the AWS account or the servers. And even if Peakspeed's allegations were accepted as true they show, at best, a misuse or misappropriation of confidential information that Tim rightfully had access to, which is not a violation of the Computer Fraud and Abuse Act in this Circuit.[61]

First, it is also undisputed that Tim has the highest-level administrative credentials for the AWS account or that the account is owned by EmersonAI. David Eaton testified that "the highest level administrator on that [AWS] account would have been Tim because he was the one that

---

[60] Pl. Memo ISO Prel. Inj. at 20-21.
[61] Tellingly, Peakspeed cites 9th Circuit precedent to support its Computer Fraud and Abuse Act claim. *See* Pl. Memo ISO Prel. Inj. at 21 (citing *United States v. Middleton*, 231 F.3d 1207, 1209 (9th Cir. 2000)).

opened the account before Peakspeed existed."[62] David Eaton also admitted

that the AWS account was originally owned by EmersonAI.[63] Accordingly,

Tim, as the sole owner of EmersonAI, was the only person with the

authority to transfer the AWS account to Peakspeed.[64] But Tim testified

that he "never transferred" the AWS account to Peakspeed or anyone else.[65]

Peakspeed's only contrary evidence is David Eaton's uncorroborated

claim that the AWS account was at some unspecified time "changed to

Peakspeed" and "the costs of this account were paid for by Peakspeed."[66]

But the source of this claim is a conversation Mr. Eaton allegedly had with

someone at AWS who told Mr. Eaton that the name on the AWS account

had been listed as Peakspeed at some point.[67] However, this is inadmissible

hearsay since it concerns what David Eaton was told and is offered for the

truth of the matter asserted. FED. R. EVID. 802. And even if this were

true it is not proof that Peakspeed ever owned the AWS account.

Correspondingly, it is also untrue that Peakspeed ever paid for the AWS

account. Invoices from the AWS account were sent to Tim's EmersonAI

---

[62] Ex. 2: Eaton Depo. at 157:10-15, 199:1-11.
[63] Dkt. 7: Eaton Decl. at ¶ 17 ("An AWS account was opened under 'EmersonAI' because Peakspeed has not yet been incorporated…").
[64] Ex. 1: Emerson Depo. at 151:12-152:7.
[65] *Id.* ("And I'm the only one that can legitimately transfer an account. Nobody else has that ability. And I never transferred. Very clear on that.").
[66] Dkt. 7: Eaton Decl. at ¶ 17.
[67] Ex. 2: Eaton Depo. at ¶ 156:6-24.

email address, were paid by EmersonAI's credit card, and listed EmersonAI

as entity being billed, as shown in the excerpts below from the March, April,

May, and June 2020 AWS invoices.:[68]



[68] Ex. 9.

Simply put, there is no evidence that Peakspeed ever owned the AWS account. Accordingly, Tim, as the owner and highest-level administrator, did not exceed his authority when he revoked the credentials of certain individuals from the AWS account.

Second, it is undisputed that Tim (or his wholly owned company, EmersonAI) also owns the two servers that Peakspeed has accused him of unlawfully "locking Peakspeed employees out of."[69] David Eaton testified that the two servers at issue are "used Hewlett Packard servers running at Tim's house."[70] And that it was David Eaton's understanding that "when EmersonAI was formed by Dan and Tim, that they both contributed money to buy those two servers to do development on."[71] David Eaton has also admitted that these two development servers were only being used with Tim's permission by Peakspeed.[72] Since Tim owned these servers and was

---

[69] Pl. Memo ISO Prel. Inj. at 20-21.

[70] Ex. 2: Eaton Depo. at 202:17-203:6.

[71] Ex. 2: Eaton Depo. at 203:1-6.

[72] Dkt. 7: Eaton's Decl. at ¶ 20.

permitting Peakspeed to use them, he was allowed to revoke that permission.

Therefore, Peakspeed has failed to demonstrate that it is likely to succeed on its Computer Fraud and Abuse Act claim.

### 3. Peakspeed's conversion claim fails because Peakspeed has not proved that it owns the AWS account or that the allegedly stolen $20,000 credit ever existed.

Peakspeed's conversion claim similarly fails because Peakspeed failed to demonstrate that it owns the AWS account or that the $20,000 credit it claims Tim stole even exists. Tim testified that the AWS account was only ever given a $2,500 credit, of which $1,184.30 was remaining as of September 1, 2020.[73]



Peakspeed has offered no proof that the alleged $20,000 AWS credit

---

[73] Ex. 1: Emerson Depo. at 153:21-154:7; Declaration of Timothy Emerson in support of his Opposition to Peakspeed's Motion for Preliminary Injunction at ¶ 6.

exists.[74] David Eaton testified that he had no evidence of the $20,000 AWS credit other than a vague memory that "e-mails went around the company … signifying that we had that credit."[75] But he was unable to recall when that credit was awarded or how much of that credit remained at the time Tim revoked access to the AWS account.[76]

Therefore, Peakspeed has failed to demonstrate that it is likely to succeed on its Conversion claim.

## C. Second, Peakspeed's Motion for Preliminary Injunction should also be denied because Peakspeed has failed to show irreparable harm.

Peakspeed's Motion for Preliminary Injunction should also be denied because it has failed to show any irreparable harm will occur absent an injunction. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The harm must be "likely in the absence of an injunction, great, and of such imminence that there is a clear and present need for equitable relief." *Minn. RFL Republican Farmer Labor Caucus v. Freeman*, No. 19-cv-1949, 2020 WL 5512509, at *5 (D. Minn. Sep. 14, 2020)

---

[74] Pl. Memo ISO Prel. Inj. at 20-22 (citing no evidence); Dkt. 7: Eaton Decl. at ¶ 20 (referring to $20,000 AWS credit but citing no evidence).
[75] Ex. 2: Eaton Depo. at 199:12-200:6.
[76] *Id.* at 200:21-201:8.

(Tostrud, J.) (cleaned up) (citing *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). So Peakspeed must make a "clear showing of immediate irreparable injury" to succeed. *Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-cv-2671, 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (Doty, J.).

Peakspeed has failed to show irreparable harm because its allegations concern (i) harm to its relationship with Xilinx that has already occurred, (ii) speculative harm related to Peakspeed's purported opportunity to become a leader in the marketplace, and (iii) speculative harm based on the possibility that Tim may compete against Peakspeed or publicize the source code to a Peakspeed competitor.[77]

First, Peakspeed's allegations concerning harm to its relationship with Xilinx do not demonstrate "immediate irreparable injury" because the damages to Peakspeed's relationship with Xilinx has already occurred and cannot be cured by an injunction. *Tri-State Grease & Tallow Co. v. Milk Specialities Co*, No. 11-cv-709, 2011 WL 1561674, at *7 (D. Minn. Apr. 22, 2011) (Kyle, J) (holding that damage to a business relationship that "is already done" is not a "threat of *ongoing* irreparable harm, rendering injunctive relief inappropriate."). Peakspeed's only evidence to support this

---

[77] Pl. Memo ISO Prel. Inj. at 22-24.

allegation of irreparable harm is a text message from Tim warning that if

Peakspeed files a lawsuit against him Xilinx will not do business with either

Peakspeed or EmersonAI until it is resolved.[78]

But Peakspeed admits that Dean Moss, a Xilinx executive, already

informed it that "a dispute over ownership could cause a problem between

Xilinx and Peakspeed."[79] And David Eaton testified that "Xilinx, our

number one partner, *has suspended payments* that they had committed to in

contract as a result of Tim raising this cloud of concern over who owns

Peakspeed."[80] A preliminary injunction cannot prevent this allegedly

irreparable harm because it has already occurred. *Tri-State Grease & Tallow*

*Co.*, 2011 WL 1561674, at *7.

Second, Peakspeed's allegation that it will "lose the opportunity to

establish itself as a leader and innovator in the marketplace" absent a

preliminary injunction is unsupported by any evidence and is purely

speculative.[81] Claims of a potential future competitive disadvantages are

routinely held to be insufficient to show irreparable harm because they are

"too remote and speculative." *See, e.g., Berkley Risk Administrators Co.,*

*LLC*, 2016 WL 4472943, at *4 ("BRAC's claims that it will lose a

---

[78] Dkt. 7: Eaton Decl. at ¶ 25.
[79] *Id.* at ¶ 23.
[80] Ex. 2 Eaton Depo. at 247:23-248:2 (emphasis added).
[81] Pl. Memo ISO Prel. Inj. at 23.

competitive advantage because AF Group will use its trade secrets to bid against it in 2019 are too remote and speculative to show irreparable harm.").

Third, Peakspeed's allegations that Tim might "compete against Peakspeed or publicize the code to a Peakspeed competitor" are also speculative and allege a harm that is not irreparable since it can be cured by money damages. Essentially, Peakspeed is alleging that absent a preliminary injunction it might lose future customers. But allegations concerning lost customer relationships are "equivalent to a claim of lost profits and could therefore be compensated as money damages." *Mainstream Fashions Franchising, Inc. v. All These Things, LLC,* 453 F. Supp. 3d 1167[82] (D. Minn. 2020) (Nelson, J.) (cleaned up); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (Questioning whether "loss of customers or customer goodwill are truly 'irreparable' in the sense that they could not be addressed through money damages.").

And there is no evidence in the record that Tim is competing with Peakspeed. And even if he is, there is no evidence that any resulting harm to Peakspeed could not be remedied by money damages. *NewLeaf Designs, LLC v. BestBins Corp.*, 168 F. Supp. 2d 1039, 1045 (D. Minn. 2001)

---

[82] Page numbers are (as of Oct. 1, 2020) unavailable in Westlaw for this case so I am unable to provide the pin cite.

(Tunheim, J) (holding that competition from defendant's competing product not sufficient to show irreparable harm). General allegations of damage to reputation and goodwill are not sufficient to show irreparable harm. *Weg Elec. Corp v. Pethers*, No. 16-cv-471, 2016 WL 1441793, at *3 (D. Minn. Apr. 12, 2016) (Doty, J) ("Damage to reputation and goodwill may qualify as irreparable harm. General allegations as to these harms, however, do not suffice.") (citations omitted).

Finally, David Eaton testified in his deposition that Peakspeed's "customers aren't clamoring for [its] solution."[83] So it is unclear that Peakspeed even has any potential customers to lose or that the loss could not be compensated by money damages. *Berkley Risk Adm'rs Co.*, 2016 WL 4472943, at *4 ("BRAC claims that it will lose customers and contract opportunities, but these alleged harms, which sound in a claim for tortious interference with a business relationship or business expectancy, are commonly remedied through monetary damages.").

Therefore, Peakspeed's request for a preliminary injunction must be denied because it has failed to demonstrate any irreparable harm.

---

[83] Ex. 2 Eaton Depo. at 208:25-210:23.

**D. Third, the Court should deny Peakspeed's Motion because the balance of harms weigh heavily against a preliminary injunction since an injunction would put EmersonAI out of business.**

The Court should also deny Peakspeed's request for a preliminary injunction because the balance of harms weighs heavily against granting it. If Peakspeed's preliminary injunction were granted it would prevent Tim's company, EmersonAI, from conducting its business. EmersonAI developed TrueView as part of a Development and Marketing Agreement between EmersonAI and Xilinx that it entered into in March 2019, long before Peakspeed existed.[84] And EmersonAI owns the registered copyright to TrueView.[85] So Peakspeed's injunction would prevent EmersonAI from utilizing its own source code and most likely cause it to go out of business.[86]

Accordingly, the harm to Tim and EmersonAI from Peakspeed's requested preliminary injunction is severe. *NewLeaf Designs, LLC*., 168 F. Supp. 2d at 1045-46 (holding that balance of harms weighed against granting preliminary injunction when the injunction would put defendant out of business).

Therefore, any harm that would result from Peakspeed having to compete with Tim or EmersonAI during the pendency of this case is

---

[84] Dkt. 24: Emerson Decl. ¶ 16.
[85] Ex. 7.
[86] Declaration of Timothy Emerson in support of his Opposition to Peakspeed's Motion for Preliminary Injunction at ¶ 7-8.

outweighed by the harm Tim and EmersonAI would suffer if the Court granted the preliminary injunction.

### E. Finally, the Court should strike paragraphs 15 and 17 of David Eaton's declaration under Rule 602 because he lacks personal knowledge of those matters.

Finally, the Court should strike paragraphs 15 and 17 of David Eaton's Declaration because he lacks personal knowledge of the facts he testified about in those paragraphs.

Under Federal Rule of Evidence 602, a witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Paragraphs 15 and 17 must be excluded because the Mr. Eaton testified under oath that he lacks personal knowledge of the matters discussed in those paragraphs.

In paragraph 15 of his declaration, Mr. Eaton testifies at length about the number of lines in the TrueView source code and the number of lines of code that Tim allegedly contributed to TrueView.[87] But at his deposition, Mr. Eaton testified that this information was provided to him by Oscar Kramer who generated it by running an unknown report, using unknown software, and unknown parameters.[88] Mr. Eaton testified that he's "not familiar with how to run the report" and that he "just saw the results of the

---

[87] Dkt. 7: Eaton Decl. at ¶ 15.
[88] Ex. 2: Eaton Depo. at 126:20-131:15.

report" and that he does not know how the tool that generated the report even defines a line of code.[89] This is because, as Mr. Eaton testified, "parsing through source code is not my role or responsibility as CEO."[90] Mr. Eaton never even reviewed the TrueView source code until May or June of 2020.[91]

Additionally, in paragraph 15 of his declaration, Mr. Eaton testifies about what Tim worked on and the discretion a programmer has when writing code for an FPGA.[92] But Mr. Eaton admitted in his deposition that he does not know what work Tim actually performed; only what Tim was responsible for.[93] Mr. Eaton also testified that he has never converted CPU-based code into FPGA-based code, is not a programmer, and has never programmed an FPGA.[94] Accordingly, Mr. Eaton lacks personal knowledge that (i) "Emerson worked on coding one component-programming the FPGA to carry out the trigonometric calculations needed for orthorectification" and (ii) the "amount of discretion a programmer has in writing code for such calculations is limited" as he stated in paragraph 15 of

---

[89] *Id.* at 127:6-22.
[90] *Id.* at 97:5-22.
[91] *Id.* at 254:19-255:10.
[92] Dkt. 7: Eaton Decl. at ¶ 15.
[93] Ex. 2: Eaton Depo. at 111:7-21.
[94] Ex. 2: Eaton Depo. at 119:16-120:9.

his declaration.[95]

This means that the entirety of paragraph 15 is inadmissible since Mr. Eaton lacks personal knowledge of all matters contained therein.

Similarly, paragraph 17 of Mr. Eaton's declaration should also be struck. In paragraph 17, Mr. Eaton testified that Peakspeed paid for all the tools used by Tim when he wrote source code and that EmersonAI's AWS account had been transferred to and paid for by Peakspeed.[96] But during his deposition, Mr. Eaton admitted that he did not know who had paid for various software licenses, whether certain tools were being paid using EmersonAI's credit card or Peakspeed's, and had no knowledge of whether EmersonAI's AWS account had ever been transferred to Peakspeed because he "was not the one that did that."[97] Mr. Eaton's only source of knowledge regarding the transfer of the AWS account comes from what his team told him or what he learned from an AWS representative during a phone call, both of which are inadmissible hearsay.[98] FED. R. EVID. 802.

Therefore, paragraphs 15 and 17 are inadmissible under Federal Rule of Evidence 602 because Mr. Eaton has admitted that he lacks personal knowledge of the subject matter of his testimony.

---

[95] Dkt. 7: Eaton Decl. at ¶ 15.
[96] Dkt. 7: Eaton Decl. at ¶ 17.
[97] Ex. 2: Eaton Dep. at 145:6-14, 146:17-148:20, 155:17-156:24.
[98] *Id.* at 155:17-156:24.

## IV.   Conclusion

Peakspeed has failed to offer any proof that it is the owner of the TrueView copyright. Its only evidence is an interested declaration from its CEO who has subsequently admitted that he lacks personal knowledge of key facts he testified to.

By contrast, as the registered copyright holder, EmersonAI enjoys a statutory presumption that it owns the TrueView copyright and that its copyright is valid. And it is undisputed that Timothy Emerson authored TrueView in 2019—before Peakspeed existed—for EmersonAI and no written agreements transferring or assigning the TrueView copyright from either Tim or EmersonAI to Peakspeed exist.

Therefore, Peakspeed's motion must be denied because it has not, and cannot, show a likelihood of success on the merits of any of its claim.

CHRIS EVANS FIRM LLC

Dated: October 1, 2020

By */s/ Christopher L. Evans*
Christopher L. Evans*
7260 E. Geddes Pl
Centennial, CO 80112
Telephone: (214) 394-6779
chris@clefirm.com
*Admitted *pro hac vice*

Dawn C. Van Tassel #297525
VAN TASSEL LAW FIRM, LLC
2909 South Wayzata Boulevard
Minneapolis, MN 55405
Telephone: (612) 460-0625
dawn@dawnvantassel.com

Attorneys for Defendant Timothy
Emerson