UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Peakspeed, Inc.,

                    Plaintiff,

v.

Timothy Emerson,

                    Defendant.

Civil File No. 0:20-cv-01630-JRT-BRT

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

---

## <u>INTRODUCTION</u>

Defendant Timothy Emerson's ("Emerson") motion to dismiss attempts to minimize Emerson's relationship with Plaintiff Peakspeed Inc. ("Peakspeed") and downplays his involvement with the Minnesota-based enterprise.  Limited jurisdictional discovery has confirmed that Emerson has significant contacts with the State of Minnesota, singularly through his involvement and shared-ownership of the Minnesota-based corporation, Peakspeed.

As a one-third owner of Peakspeed, Emerson played an integral role in the creation of the Minnesota-based company.  Peakspeed's primary place of business is Minnesota and benefits to its employees flow from Minnesota.  Peakspeed's Chief Executive Officer ("CEO") resides in Minnesota; its Vice President of Engineering resides in Minnesota; the finances and managerial aspects of the company are handled from Minnesota; and Peakspeed's vetted clients are based in Minnesota.  As a part-owner and integral part of the Peakspeed team, Emerson had constant daily contacts with the forum state of Minnesota.

Based on a totality of the circumstances, specific personal jurisdiction under the Eighth Circuit's five-part test is established. Additionally, Emerson's tortious actions towards the forum state are a basis for personal jurisdiction. Emerson has tortiously converted Peakspeed funds and, under the *Calder* effects test, effectively has committed an intentional tort expressly aimed at the forum state. Finally, Emerson reasonably knew based on Peakspeed's place of business and its CEO's place of residence, that he could be haled into court in Minnesota. For all these reasons, and the others discussed below, Emerson's motion to dismiss for lack of personal jurisdiction should be denied.

## BACKGROUND

### I.    Emerson's Longstanding Ties with Minnesota

Emerson's ties to Minnesota relate back approximately 35 years when he lived in Saint Paul and attended The University of Saint Thomas. Decl. of Donna Reuter ("Reuter Decl.") Ex. 1, at 14:6–11. He spent four years in Saint Paul while he earned his computer science degree. *Id.* at 14:3, 14:11. He also worked for Cray Research, located in Mendota Heights, Minnesota. *Id. at* 15:19–21.

In mid-2019 Emerson connected with David Eaton, an acquaintance and Minnesota resident, to help him salvage his floundering business, EmersonAI LLC ("EmersonAI"). *Id.* at 118:6–13. David Eaton did so, going so far as to extend EmersonAI a $25,000 bridge loan from his personal funds. *Id.*; *see also* Reuter Decl. Ex. 2 (showing transfer of funds to EmersonAI business checking from David Eaton in Wayzata, MN). EmersonAI was failing, but the shared vision of creating a novel

2

orthorectification software was still believed to be achievable.  Reuter Decl. Ex. 3, at

242:12–23.  David Eaton had no interest in resurrecting EmersonAI, but rather wanted to

be part of something new.  *Id.* at 232:19–24.  The transition to a new company,

Peakspeed, was under discussion.

## II.      Emerson and Minnesota Resident David Eaton Work Together to Form Peakspeed, a Delaware Corporation Based in Minnesota

David Eaton took on the task of setting up Peakspeed in early 2020.  Reuter Decl.

Ex. 1, at 108:13–109:4.  For David Eaton to helm the organization made the most sense:

he had successfully sold a startup to Hewlett-Packard, which demonstrated his business

acumen, and more importantly he had the funds to finance the venture.  Reuter Decl.

Ex. 3, at 217:25–218:3, 235:2–4.  Upon mutual agreement, David Eaton, Emerson, and a

third individual agreed to form and each share in a third ownership of the corporation,

Peakspeed.  Reuter Decl. Ex. 1, at 114:5–7; *see also id.* at 119:22–24 ("[W]e had an

agreement that we were forming Peakspeed, a third, a third, a third.  He would be CEO; I

would be CTO."); Reuter Decl. Ex. 4 ("I believe the number one priority for us 3 is to get

the transition from EmersonAI to Peakspeed, Inc. completed.").  Accordingly, Peakspeed

was incorporated in Delaware with its principle place of business in Minnesota.  Compl.

¶ 5.  Invoices and accounts list Peakspeed's billing address in Excelsior, Minnesota.  *See*

*generally* Reuter Decl. Ex. 5.

## III.     In his Capacity as CTO of Peakspeed, Emerson was Involved in Daily Calls, Emails, and Conversations with Individuals in Minnesota

Peakspeed employees all worked remotely from home offices.  *See generally*

Reuter Decl. Ex. 3, at 136:25–137:1–17.  By July 2020, the company had eight

employees, two of whom lived in Minnesota. *Id.* at 137:18–25. The remainder were located in Florida, Colorado, and Texas. *Id.* at 136:25–137:17. Daily communications via email, text, and messenger transpired between employees. *See* Decl. of David Zimmerman ("Zimmerman Decl.") ¶ 6; Decl. of David Caliga ("Caliga Decl.") ¶ 6. *See e.g.*, Reuter Decl. Ex. 13, at 1 (listing Emerson's email address as Tim.Emerson@peakspeed.io). Microsoft Teams conversations were recurrent amongst employees. *See, e.g.*, Reuter Decl. Ex. 6 (message from Emerson to dev@peakspeed.io: "Great work everyone. It took a lot of hard work putting together the new development environment.").

Emerson was an integral member of Peakspeed. Reuter Decl. Ex. 1, at 140:22–25 ("[S]o we had a disagreement on whether – he saw me as an employee. I saw myself as a partner. We each owned a third of Peakspeed. That's why I thought myself as a partner."). Emerson characterized his role as working on the technology, while David Eaton managed Peakspeed's business needs. *Id.* at 108:7–15, 167:8–12. As the corporation's Chief Technical Officer, Emerson worked on source code daily during 2020. *Id.* at 137:17–19. Emerson was also privy to Peakspeed's proprietary information. *Id.* at 28:19–29:7.

As an integral member of the team, Emerson often communicated with core programmers daily via Microsoft Teams. *See e.g.*, Reuter Decl. Ex. 1, at 137:8–13; Ex. 14; Ex. 15; Ex. 16. Additionally, he was in constant contact with CEO David Eaton and VP of Engineering David Zimmerman, both Minnesota residents. *See* Reuter Decl. Ex. 1, at 109:5–13; Zimmerman Decl. ¶ 7.

4

**IV.      Emerson Executed a Contract, on Behalf of Peakspeed, Listing Peakspeed's Minnesota Address**

In his capacity as "President and CTO" Emerson signed a Non-Disclosure agreement between Peakspeed and Xilinx in March 2020.  Reuter Decl. Ex. 7.  The document lists Peakspeed's principle office at Excelsior, Minnesota.  *Id.*  Emerson signed on behalf of Peakspeed.  Reuter Decl. Ex. 1, at 113:2–8.  At the time of signing, Emerson believed himself to be a co-owner of the Minnesota-based organization, Peakspeed.  *Id.* at 113:12–15.

**V.      Peakspeed's Funding Came from Minnesota**

One of David Eaton's roles was handling company finances.  Reuter Decl. Ex. 3, at 34:1–3.  Instead of paying the bills and salaries directly from his personal account (in Minnesota) he transferred his funds to a Wells Fargo account created by Emerson.  *Id.* at 34:23–35:8; *see also* Reuter Decl. Ex. 2.  That Wells Fargo account, opened by EmersonAI before Peakspeed was formed, was already set up with direct deposit for some of the individuals who became Peakspeed employees.  Reuter Decl. Ex. 3, at 62:10–63:10.  David Eaton opened a Peakspeed bank account and in June 2020, was finally able to pay employees directly from the Peakspeed account.  *Id.* at 63:12–21.  Regardless of the circuitous method of disbursing funds, *all* funds flowed from David Eaton's account in Minnesota and ultimately paid all of Peakspeed's expenses.  His funding kept Peakspeed afloat.

In late 2019, as EmersonAI was failing, Emerson acknowledged Eaton's contributions: "I truly appreciate all your support and generosity.  Without the Eatons

EmersonAI would not exist today.  When we switch to a C-corp, it would also be a good time to recognize that the company is way more than Emerson."  Reuter Decl. Ex. 8.  In this exchange, Emerson is referencing the $25,000 David Eaton has offered to keep EmersonAI afloat until the company employees can be transitioned to Peakspeed.

As explained above Peakspeed employee salaries and benefits flowed from David Eaton's personal bank account.  Ultimately, Emerson was paid out of the funds provided by David Eaton.  Furthermore, company invoices and bills were billed to David Eaton and his funds paid the outstanding debt.  *See, e.g.*, Reuter Decl. Ex. 9.  David Eaton paid for employee equipment and software development tools used by employees and downloaded on employee computers.  *See, e.g.*, Reuter Decl. Exs. 10–12.  Ultimately all these resources flowed from Minnesota.

## VI.     Several of Peakspeed's Potential Clients and Partners are based in Minnesota

Aside from managing the company's finances and cash flow, David Eaton managed Peakspeed's commercialization.  Emerson characterizes David Eaton as a great salesman.  Reuter Decl. Ex. 1, at 164:3–7. David Eaton's involvement was essential to building business relationships with potential clients.  Reuter Decl. Ex. 3, 141:4–10.

Many of Peakspeed's potential clients are recognizable Minnesota-based organizations.  Eaton was in negotiations with both commercial and government customers in Minnesota.  Reuter Decl. Ex. 1, at 138:12–15.  This connection with Minnesota is not coincidental; rather, David Eaton's reputation and ties to Minnesota fostered these local relationships and rapport.  Reuter Decl. Ex. 3, 141:4–10.  *See id.* ("I have [a] lot more relationships with large companies in Minnesota, so that is a natural

place for us to be concentrating our sales effort."). Fundamentally, Peakspeed's potential client roster reflects the significance of David Eaton's connections with Minnesota-based businesses.[1]

## VII.   A Dispute Arises, and This Lawsuit is Filed

In July 2020, Emerson informed Eaton—for the first time—that Emerson believed the source code generated by Peakspeed employees from January to July 2020 was in fact owned by a separate entity, his company, EmersonAI. ECF No. 24, ¶ 86. Emerson claims to be under the impression that for the entirety of 2020, EmersonAI was working in tandem with Peakspeed as two wholly different organizations. *See* Reuter Decl. Ex. 1, at 76:24–77:3.

Emerson also claims that he has "never been paid anything by Peakspeed" and all his work through July 2020 was done for EmersonAI through his consulting firm Emerson Consulting LLC. ECF No. 24, ¶ 113. This distorted version of reality is shared only by Emerson and is refuted by the record. Reuter Decl. Ex. 1, at 140:23–25 ("[S]o we had a disagreement on whether – he saw me as an employee. I saw myself as a partner. We each owned a third of Peakspeed. That's why I thought myself as a partner."). CEO David Eaton and the six employees he managed, understood that they were working for Peakspeed. *See* Decl. of Oscar Kramer ("Kramer Decl.") ¶ 2; Decl. of Patrick Losique ("Losique Decl.") ¶ 3; Decl. of Matthew Baldin ("Baldin Decl.") ¶ 3;

---

[1] The names of Peakspeed's potential clients have been omitted because this information is highly confidential and has been designated as Attorneys' Eyes Only.

Decl. of Joe Greshik ("Greshik Decl.") ¶ 3; Caliga Decl. ¶ 2; Zimmerman Decl. ¶ 2. They all continue to work for Peakspeed. *Id.*

Because the Peakspeed principals and employees were focused primarily on developing and marketing software to make the business viable, the administrative aspects of Peakspeed were implemented over time. For example, the corporation was registered in late January, the Peakspeed bank account was set up in February, and the Peakspeed account finally had the ability to make direct deposit payments to employees in June. Reuter Decl. Ex. 3, at 16:10–17, 63:12–21. The code was transferred to Peakspeed, Mr. Emerson began signing agreements on behalf of Peakspeed, and the registration of products and software – including Microsoft, the Xilinx account, and so on – were transitioned to Peakspeed over a period of weeks. *See* Reuter Decl. Exs. 5, 7.

The record supports that the companies overlapped in many ways and that Emerson knew he was working for Peakspeed, despite his current denials. Emerson now disclaims a relationship with Peakspeed in order to evade personal jurisdiction in Minnesota. On August 28, Emerson filed a motion to dismiss this case for lack of personal jurisdiction, arguing that this dispute is insufficiently related to Minnesota to justify an exercise of jurisdiction. *See* ECF Nos. 21, 23. Plaintiff opposes this motion.

## ARGUMENT

This is an intellectual property dispute between a corporation based in Minnesota and Emerson. For over half a year, Emerson worked with others to create code. In that capacity, he held himself out as CTO of Peakspeed, he used a Peakspeed email account,

he utilized software paid for by Peakspeed, and he executed a contract on behalf of Peakspeed.

## I.   Legal Standards

Emerson seeks to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2).  In order to survive a motion to dismiss for lack of personal jurisdiction Plaintiff need only make a *prima facie* case showing personal jurisdiction exists. *Zumwalt v. Advanced Mktg. & Processing, Inc.*, No. 19-cv-2194 (PJS/LIB), 2019 U.S. Dist. LEXIS 211733, at *3 (D. Minn. Nov. 8, 2019), *adopted by* 2019 U.S. Dist. LEXIS 210645 (D. Minn. Dec. 6, 2019) (citing *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011)).  Here, both parties have engaged in limited jurisdictional discovery and there has been no evidentiary hearing; therefore, the prima facie standard is appropriate.  *Equine PSSM Genetics, LLC v. Animal Genetics*, *Inc.*, No. 14-493 (MJD/FLN), 2015 U.S. Dist. LEXIS 23967, at *5–6 n.1 (D. Minn. Feb. 10, 2015); *see also Northbrook Dig. LLC v. Vendio Servs.*, 625 F. Supp. 2d 728, 748 (D. Minn. 2008) ("Neither party represents that jurisdictional discovery is complete . . . or advises that an evidentiary hearing is needed.  Without further guidance from the parties, this Court concludes that the prima facie standard applies to the current motion.")

Peakspeed must show that Minnesota's long-arm statute has been satisfied and that the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.  *Wessels v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995). Such a showing requires only "sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state."  *Id.* (internal quotations

omitted).  The "evidentiary showing required at the prima facie stage is minimal." *K-V Pharm. Co.*, 648 F.3d at 592.  Furthermore, such evidentiary support provided in the pleadings, affidavits, and exhibits supporting or opposing the motion is viewed in the light most favorable to the plaintiff.  *Id.*; *Northbrook Dig.*, 625 F. Supp. 2d at 748 ("The prima facie standard still controls when the parties provide documentary evidence beyond the allegations in the complaint."  (citations omitted)); *Equine PSSM Genetics*, 2015 U.S. Dist. LEXIS 23967 at *6 n.1 (finding prima facie standard was appropriate as the Court was "solely relying on the motion papers and written submissions").  All factual conflicts must be resolved in plaintiff's favor in "deciding whether the plaintiff made the requisite showing."  *K-V Pharm. Co.*, 648 F.3d at 592.

## II.     This Court Has Specific Personal Jurisdiction Over Emerson Based on His Substantial, Repeated Contacts with Minnesota Individuals and Corporations, Directly Related to This Dispute

Personal jurisdiction may be established in one of two ways—general or specific jurisdiction.  *Advanced Duplication Servs.,LLC v. Payne*, No. A05-1132, 2006 Minn. App. Unpub. LEXIS 254, at *6 (Mar. 21, 2006).  For specific jurisdiction, a non-resident defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted).  If personal jurisdiction is established for any single claim, the Court may exercise jurisdiction over any other claims that "arise out of the same common nucleus of operative facts" pursuant to the doctrine of pendent personal jurisdiction.  *Rilley v.*

10

*MoneyMutual, LLC*, No. 16–4001 (DWF/LIB), 2017 U.S. Dist. LEXIS 139377, at *6–7
(D. Minn. Aug. 30, 2017).

Emerson must have "fair warning" that his Minnesota contacts, "may subject
[him] to . . . jurisdiction" here. *Burger King Corp. v. Rudzewica*, 471 U.S. 462, 472
(1985) (quotations omitted). The "fair warning" requirement will be met if Emerson "has
purposefully directed his activities at residents of [Minnesota], and the litigation results
from alleged injuries that arise out of or relate to those activities." *Id.* (quotations and
citations omitted). Such Minnesota contacts must not "arise[] due to mere fortuity, but
rather he must have 'purposefully availed himself of the benefits and protections of th[is]
state." *Custom Conveyor Corp. v. Hyde*, 237 F. Supp. 3d 895, 898 (D. Minn. 2017)
(internal citations and quotation marks omitted).

The Eighth Circuit considers five factors when determining whether sufficient
minimum contacts exist for personal jurisdiction: "(1) the nature and quality of the
contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the
cause of action to the contacts; (4) the interest of [the forum state] in providing a forum
for its residents; and (5) the convenience or inconvenience to the parties." *K-V Pharm.*,
648 F.3d at 592 (alteration in original) (quotations omitted). The first three factors are
the primary factors considered in the analysis; however, all factors are considered in the
aggregate in deciding whether personal jurisdiction exists. *Custom Conveyor Corp.*, 237
F. Supp. 3d at 899; *see K-V Pharm.*, 648 F.3d at 592–93 ("[W]e look at all of the factors
and the totality of the circumstances in deciding whether personal jurisdiction exists.").

In addition to this five-part "minimum contacts" test, personal jurisdiction can be supported by the *Calder* "effects test" to establish that Emerson's contacts with Minnesota are sufficient to support a finding of specific personal jurisdiction. *Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*, No. 19-cv-02871 (SRN/ECW), 2020 U.S. Dist. LEXIS 143810, at *22 (D. Minn Aug. 11, 2020) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).   Under the "effects test," personal jurisdiction can be established by a prima facie showing that "'the defendant's acts (1) were intentional, (2) uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum].'"  *Id.* (quoting *Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 878 (D. Minn. 2019)).   This test in conjunction with the five-factor analysis, establishes specific personal jurisdiction.

### A.   The Nature, Quality, and Quantity of Emerson's Contacts with Minnesota Supports Personal Jurisdiction

Based on Emerson's involvement with the formation of a Minnesota business and all the inherent duties and responsibilities therein, he has effectuated extensive contacts with Minnesota.  Emerson was an owner with a one-third interest in Peakspeed, a company that lists its physical address as Excelsior Minnesota.  As an officer of the organization he engaged in daily communications with employees living and working from Minnesota.  Furthermore, Emerson knew that co-owner and CEO, David Eaton, a Minnesota resident would reasonably seek resolution from a Minnesota court in the event of a dispute.  Emerson minimizes his relationship with Plaintiff and also downplays his

role and position within the organization.  In more than one instance, Emerson relies on authority that supports Plaintiffs position.  *See Calder,* 465 U.S. at 791 (affirming the lower court's finding of personal jurisdiction); *Bandemer v. Ford Motor Co.*, 931 N.W.2d 744, 751 (Minn. 2019) (affirming lower court's finding of specific personal jurisdiction); *Sproqit Techs., Inc. v. Visto Corp.*, No. 04-CV-891 (JMR/FLN), 2004 U.S. Dist. LEXIS 22156, at *15 (D. Minn. Nov. 2, 2004) (denying defendants' motion to dismiss but granting defendants' motion to transfer).

In order to establish specific jurisdiction, the nature, quantity, and quality of Emerson's contacts with Minnesota must be evaluated (*i.e.*, the first three factors of the Eighth Circuit's test).  *Travel Leaders*, 2020 U.S. Dist. LEXIS 143810, at *27.  This permits consideration of "how purposeful the defendant's contact" is with the forum state and while "random, fortuitous, and attenuated contacts do not confer personal jurisdiction, even a single contact of the right nature and of sufficient quality can be enough."  *Id.* (quotations omitted)*; see Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1021 (D. Minn. 2008) ("[J]ust because a suit arises from a defendant's single contact with a forum state, it does not follow that the forum cannot exercise personal jurisdiction over the defendant.")

For a multitude of reasons Emerson has availed himself to Minnesota.  First, and foremost, Emerson was a co-owner responsible for forming the corporation, Peakspeed.  Peakspeed's principal place of business is in Minnesota.  Emerson agreed to partner with a Minnesota resident, David Eaton, and agreed to receive a one-third ownership stake in

the company.  Peakspeed was duly incorporated in Delaware with its primary place of business in Minnesota.

A majority of Peakspeed employees worked remotely from out-of-state; however, this fact alone will not defeat personal jurisdiction.  Recent court decisions support that requisite minimum contacts can still be established for remote employees as to not defeat personal jurisdiction.  *See Travel Leaders*, 2020 U.S. Dist. LEXIS 143810, at *28 (finding that almost daily communication with Minnesota-based employees, access to the Minnesota company's proprietary information, and working as an officer of the company were factors that supported jurisdiction); *Custom Conveyor*, 237 F. Supp. 3d at 901 (finding that extensive daily communication with Minnesota-based employees, employment and compensation from a Minnesota company, and alleged misappropriation of trade secrets stored in Minnesota from a Minnesota company were sufficient minimum contacts); *Patterson Dental Supply, Inc. v. Vlamis*, No. A16-0399, 2016 Minn. App. Unpub. LEXIS 894, at *9–10 (Sept. 6, 2016) (reasoning that daily communications, receipt of benefits and compensation from Minnesota, and supervision from Minnesota supported a finding of proper personal jurisdiction).

### 1.    Constant, Near Daily Communication Supports Purposeful Contact with the Forum

Frequent, daily, communications amongst out-of-state employees and Minnesota-based employees supports a finding of personal jurisdiction.  Such communications that are "near constant" and occurring "almost daily" with Minnesota-based employees supports one form of contact with the forum state.  *Custom Conveyor*, 237 F. Supp. 3d at

897, 900.  Here, Peakspeed team member communication via email, text, and Microsoft

Teams/slack was frequent and recurrent throughout the day.  Zimmerman, an employee

with supervisory oversite, and Eaton, CEO, were included in the constant stream of

communication with Emerson and other team members.  Although Emerson worked

remotely out of his home in Colorado, his job responsibilities required that he

communicate daily with other employees, including those located in Minnesota This level

of daily communication supports a high quantity of daily contacts with the forum state.

Emerson cited a number of cases to support his position that phones calls, written

correspondence, and emails are insufficient to support personal jurisdiction.  Here, the

"communications were part of some broader effort by the defendant[] to create a

connection with Minnesota" and are distinguishable from the court's finding in *Pederson*

*v. Frost*, 951 F.3d 977, 980 (8th Cir. 2020).  Furthermore, based on Emerson's actions, he

has proactively "tethered" himself to the forum state.  Emerson's contacts with

Minnesota are more than "incidental" or "scattered e-mails" or calls, accordingly the

court can find personal jurisdiction and are distinguishable from the scenarios cited by

Emerson in his brief.  Emerson does not cite to a single case where a court has found that

a remote employee communicating with another employee in the forum state was deemed

"incidental" and insufficient to support personal jurisdiction.  *See* ECF No. 23, at 24;

*Pederson*, 951 F.3d at 980 (outside counsel to California corporation later moved to

Minnesota and sued corporation); *Burlington Indus. v. Maples Indus.*, 97 F.3d 1100, 1103

(8th Cir. 1996) (Alabama corporation hired Arkansas vender to service machinery);

*Institutional Food Mktg. Assocs. Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448,

456 (8th Cir. 1984) (companies and corporation contracted with one another for sale and purchase of strawberries); *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (Missouri-based corporation sued German fan manufacturing corporation). Here, Emerson's communications to Peakspeed leadership located in Minnesota were substantive and frequent.

## 2. Essential Functions Allowing Emerson to Earn a Living Were Channeled Through Minnesota

Peakspeed's funds flowed from CEO, David Eaton's Wells Fargo account – set up and funded in Minnesota – to pay salaries, employee benefits, equipment and software fees, and all other Peakspeed expenses. As a start-up, employees knew that Eaton was paying the finances and that funds were paid from his checking personal account (this is so, even if some employees submitted invoices to EmersonAI). *See Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 355–56 (E.D. Pa. 2016) (exercising jurisdiction did "not offend traditional notions of fair play and substantial justice" because the defendants "knew they were working for a Pennsylvania company" and all the essential functions that allowed the defendants to earn a living were channeled through Pennsylvania.). Here, all of Peakspeed's essential functions, including payment of employee salaries flows from Minnesota.

In addition to paying everyone's salary, David Eaton paid for health insurance for Peakspeed employees. Zimmerman Decl. ¶ 4; Reuter Decl. Ex. 3, at 62:18-19. This payment of salary and benefits creates a continuous connection with the forum state. *Custom Conveyor*, 237 F. Supp. 3d at 901; *see SoftBrands Mfg. v. Missing Link*

*Consulting, Inc.,* No. 04-3900 ADM/AJB, 2004 U.S. Dist. LEXIS 25462, at *5 (D. Minn. Dec. 20, 2004) (finding sufficient contacts with Minnesota including that employee paychecks were issued and their benefits administered from Minnesota); *Patterson Dental*, 2016 Minn. App. Unpub. LEXIS 894 at *9 (finding that the exercise of jurisdiction was appropriate for an at-will employee who received compensation and benefits pain from Minnesota); *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 355 (E.D. Pa. 2016) ("[A]ll of these links with [the forum state] are characteristic of a traditional employer-employee relationship, except for location, underscoring that Defendants' connection to the [forum] is more than incidental.").   Accordingly, the funding of equipment, benefits, and salary paid for by funds of Peakspeed's CEO, a Minnesota resident, from a Minnesota bank account supports jurisdiction.

Software and development tool invoices list the company's billing address as Excelsior Minnesota.  These tools were downloaded on employee computers in order to perform their job duties.  This computer hardware was used by Emerson in his role as CTO.  Issuance of a laptop loaded with confidential and proprietary software by the employer supports contact with the forum state in a personal jurisdiction analysis.  *See SoftBrands*, 2004 U.S. Dist. LEXIS 25462 at *17.

### 3.   Emerson's Officer Role Allowed Access to Propriety Information and Ability to Interface with Clients

Although Emerson's tenure with Peakspeed was not long, Emerson held an officer position.  As Peakspeed's CTO Emerson frequently communicated with both the CEO, David Eaton and VP of Engineering, David Zimmerman, both Minnesota residents.

Holding a leadership position and communicating daily with Minnesota-based employees supports a substantial connection to the forum. *Taylor v. Phelan*, 912 F.2d 429, 433 n.4 (10th Cir. 1990) ("So long as it creates a substantial connection, even a single telephone call into the forum state can support jurisdiction.")  Email communications involving the initiation of Peakspeed as a c-corporation and frequent communications with AWS and Xilinx involved Emerson on almost a daily basis.  He was an integral part of the team involving formative business decisions.  *See Travel Leaders*, 2020 U.S. Dist. LEXIS 143810 at *29 (finding that defendant, company's President, was "not just [] an employee" and communicated "almost daily with Minnesota-based employees" supported jurisdiction).

Emerson argues that a "corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity."  *Blue Zones, Ltd., Liab. Co. v. Hartley.*, No. 17-CV-5097 (PJS/LIB), 2018 U.S. Dist. LEXIS 170992, at *9 (D. Minn. Oct. 2, 2018).  This reliance on the fiduciary shield doctrine has been rejected by courts in this Circuit.  *See Larson Mfg. Co. of S.D. v. Conn. Greenstar*, 929 F. Supp. 2d 924, 930 (D.S.D. 2013) referencing *Arkansas Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 574 (8th Cir. 1986).  In an action for fraud, negligent misrepresentation, and conversion, the nonresident officers who made actionable misrepresentations were found to be subject to jurisdiction in the Forum state.  *Oriental Trading Co., In. v. Firetti*, 235 F.3d 938, 943 (8th Cir. 2001).  *See also DeRosa v. McKenzie*, 936 N.w.2d 342, 346 (Minn. 2019) ("It is the universal rule that an officer of a

corporation who takes part in the commission of a tort by the corporation is personally liable therefor" (internal quotations omitted).).  Based on the allegations setting forth allegations of conversion, the fiduciary-shield doctrine is not applicable here and Emerson's argument should be rejected.

As CTO, Emerson had access to Peakspeed's proprietary information and "was the very person who initiated and implemented . . . Non-Disclosure [Agreements]." *Travel Leaders*, 2020 U.S. Dist. LEXIS 143810 at *29.   In one significant instance, Emerson signed a Non-Disclosure Agreement on behalf of Peakspeed with major client, Xilinx. See Reuter Decl. Ex. 7 (listing Peakspeed's address in Excelsior, Minnesota).  Emerson signed that document on behalf of Peakspeed and therefore cannot deny that he was not an essential member of the Minnesota-based company's team.  He further cannot deny that he was unaware that Peakspeed was a Minnesota-based company based on that signed document.

Just as this District Court determined earlier this year for a similar factually situated defendant, Emerson has substantial contacts with Minnesota and "considered in their totality and based on the claims against him, subject[s] him to suit in Minnesota." *Travel Leaders*, 2020 U.S. Dist. LEXIS 143810 at *28.  There, the defendant worked as an executive and more than just an employee for a Minnesota-based company; communicated almost daily with Minnesota-based employees; had access to company proprietary information; implemented NDA Agreements; and understood that "essential functions" allowing him to earn a living flowed were channeled through Minnesota.  *Id.*

at *29–30.  Emerson does not share all the same characteristics as the defendant in *Travel Leaders*, but this should not be enough to defeat a finding of personal jurisdiction.

Based on an evaluation of the first three, and most important factors of the Eighth Circuit's test, a finding of personal jurisdiction is supported.

### B.    The *Calder* "Effects Test" Provides an Additional Basis for Establishing Personal Jurisdiction

Application of the *Calder* "effects test" further supports this court's exercise of personal jurisdiction.  This test is applicable when a "defendant directs intentional, tortious actions at a resident of the forum, the defendant may reasonably anticipate being haled into court in the forum to answer for its conduct."  *Raymedica, Inc. v. Stoy.*, No. 01-1841 (JRT/FLN), 2002 U.S. Dist. LEXIS 19308, at *7–8 (D. Minn. Sep. 30, 2002).  *See id.* ("[C]ourts in the Eighth Circuit have applied Calder's 'effects test' to assert personal jurisdiction in cases where a defendant's minimum contacts might not otherwise be sufficient.").  Here, allegations of conversion, an intentional tort, have been brought in the Complaint.  By intentionally interfering with Peakspeed's TrueView source code, Emerson knew that Peakspeed would be injured in Minnesota because its CEO and financer resides in Minnesota.

The "effects test" requires that a "defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—there."  *Travel Leaders*, 2020 U.S. Dist. LEXIS 143810, at *33–34 (quotations omitted).  For a motion

to dismiss, the most significant factors are the second and third because the court must accept as true a plaintiff's claim that the defendant's acts were intentional.  *Id.*

To meet the test requirements, Emerson must have expressly targeted his actions at Minnesota.  *Raymedica, Inc. v. Stoy*, No. 01-1841 (JRT/FLN), 2002 U.S. Dist. LEXIS 19308, at *13 (D. Minn. Sept. 30, 2002).  The inquiry requires that a defendant "intentionally acted so as to foreseeably cause harm in Minnesota."  *Travel Leaders*, 2020 U.S. Dist. LEXIS 143810, at *34.  Emerson's "mere knowledge" that Peakspeed would be harmed in Minnesota is insufficient.  *Id.*

Here the Complaint alleges that Emerson locked Peakspeed employees out of Peakspeed's account and "willfully interfered with Peakspeed's use and possession of $20,000 . . . and slowed Peakspeed development of software."  Compl. ¶ 91.  Peakspeed is a corporation with its principal place of business in Minnesota.  *Id.* ¶ 5.  "Emerson wrongfully changed the assignment of Peakspeed's Amazon Web Service ("AWS") account . . . knowing that the resulting harm would be felt in Minnesota."  *Id.* ¶ 9.  These allegations are sufficient under *Calder* to support that defendant intentionally interfered with Peakspeed's chattel and that the brunt of the injury would fall upon Peakspeed in Minnesota.  *See Raymedica*, 2002 U.S. Dist. LEXIS 19308 at *14.  Emerson should have reasonably expected to be "haled into court" in Minnesota.  *Id.* (finding allegations that defendants intentionally interfered with a contract and that the brunt of the injury would fall upon plaintiff in Minnesota met the criteria set forth in *Calder*).

### C.       Minnesota's Interest & Convenience of the Parties

If one of these tests is satisfied, the Court may exercise personal jurisdiction over Emerson unless to do so would be so burdensome and unreasonable as to violate the Due Process Clause. *Pope*, 588 F. Supp. 2d at 1021 (explaining that defendant "must show that, in light of [his] contacts with Minnesota, the burden of litigation on [him] is so heavy that it outweighs the plaintiffs' interests, the forum's interest, and the interests of the judicial system in in the Court's exercise of jurisdiction"). This is a very stringent standard to meet, and Emerson has not come close to demonstrating such extraordinary burden to defeat personal jurisdiction.

Emerson is a resident of Colorado, and if required, can reach Minnesota by direct, two hour plane ride. Furthermore, in light of the Covid-19 health emergency, litigation in most jurisdictions is conducted remotely if possible. Emerson has failed to articulate any rationale how litigation of this matter in Minnesota would result in such a "heavy" burden that it would outweigh Plaintiff's and this Court's interest in adjudicating the matter. Even when a defendant hales from a much farther locale—such as Germany—the burden of litigating in Minnesota is not so unreasonable as to offend Due Process. *See id.* at 1022 (noting burden is not unreasonable in this "world of increasing globalization and improved communication technology").

Just as the court articulated in *Custom Conveyor*, the same came be echoed here: "[P]ersonal jurisdiction exists over [Emerson] in Minnesota. But this is perhaps not a surprising result. As discussed above, the touchstone of the due-process inquiry is

whether a defendant's forum contacts should put him on notice that he might be sued in the forum state."  237 F. Supp. 3d at 901.

### III.    In the Event Personal Jurisdiction is Not Found, this Case Should Be Transferred to the District of Colorado for Adjudication

As an alternative to dismissal for lack of personal jurisdiction, Plaintiff requests transfer to an alternate venue.  "Where . . . transfer may be made wholly within the system of U.S. federal courts, this Court effectively no longer has the power to dismiss the case outright on grounds that another venue would be a better fit for the parties or the underlying issues."  *See Jacobs Trading, LLC v. Am. Eagle Trading Grp., LLC*, No. 16-cv-00406 (SRN/KMM), 2016 U.S. Dist. LEXIS 133823, at *22 (D. Minn. Sep. 28, 2016) (quotations omitted).).

Transfer to an alternate forum is appropriate when a court lacks jurisdiction over a defendant.  *See Johnston v. Wilkins,* 709 F. App'x 404, 405 (8th Cir. 2018) (per curium) (concluding that the district court should have considered whether the interest of justice required transfer of the claim to a proper forum instead of dismissing it for lack of personal jurisdiction).  In the Eighth Circuit, transfer under 28 U.S.C. § 1631 is the proper mechanism to do so.  *NexGen HBM, Inc. v. ListReports, Inc.,* No. 16-cv-3143 (SRN/FLN), 2017 U.S. Dist. LEXIS 147033, at *41 (D. Minn. Aug. 25, 2017) ("Even where a court lacks personal jurisdiction, it retains the ability to transfer the case to a district where the case could have been brought.").   Transfer is appropriate "'if it is in the interest of justice,'" to do so, and to any district or division in which it could have

been brought.  *See NexGen*, 2017 U.S. Dist. LEXIS 147033 at *41–42 (quoting 28 U.S.C.
§ 1631).

If this court does not find specific personal jurisdiction over Emerson, Plaintiff
requests that this matter be transferred to the District of Colorado.[2]  Emerson resides in
Colorado, and therefore avails himself to that forum by way of general personal
jurisdiction.  ECF No. 23, at 1 ("Emerson is a Colorado resident . . . ."); *see Creative
Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (reasoning that
the Due Process Clause permits a court to exercise "general jurisdiction" to hear claims
against a defendant where his "affiliations with the State are so continuous and
systematic as to render [him] essentially at home in the forum state").

In the interest of justice, further adjudication of this suit cannot be delayed and
transfer to an alternate forum would be the best alternative.  The underlying suit involves
the theft of intellectual property involving computer technologies and a permanent
injunction has been filed.  Time lost in resolving this dispute furthers the harm that
Plaintiff suffers.  Plaintiff's inability to maintain client relationships and its delay to bring
its product to market increases the likelihood that a competitor can steal market
advantage.  The commercialization of Peakspeed's technology requires that time be of
the essence.

Both parties have invested significant time undergoing expedited discovery and
getting to the root of the conflict.  Outright dismissal would negate the time, effort, and

---

[2] Emerson fails to identify any alternate forum claiming that "determinations of
intellectual property ownership . . . has no geographic presence."  ECF No. 23, at 28.

money already spent pursing resolution of this matter.  For these reasons, transfer to an alternate venue would be most appropriate if personal jurisdiction is not found.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Emerson's motion to dismiss or in the alternative, transfer this case to the District of Colorado for adjudication.

DORSEY & WHITNEY LLP

Dated:  October 1, 2020

By */s/ Donna Reuter*
    RJ Zayed # 0309849
    zayed.rj@dorsey.com
    Shannon Bjorklund #0389932
    bjorklund.shannon@dorsey.com
    Forrest K. Tahdooahnippah #391459
    forrest@dorsey.com
    Payton George #0400073
    george.payton@dorsey.com
    Donna Reuter #0400572
    reuter.donna@dorsey.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

***Attorneys for Plaintiff Peakspeed, Inc.***