```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
        ------------------------------------------------------------
 3                                   )
        Peakspeed, Inc.,             )  File No. 20-cv-1630
 4                                   )            (JRT/BRT)
                Plaintiff,           )
 5                                   )
        v.                           )
 6                                   )  Zoom Video Conference
        Timothy Emerson,             )  Minneapolis, Minnesota
 7                                   )  Thursday, October 15, 2020
                Defendant.           )  11:09 a.m.
 8                                   )
        ------------------------------------------------------------
 9
                    BEFORE THE HONORABLE JOHN R. TUNHEIM
10          CHIEF JUDGE OF THE UNITED STATES DISTRICT COURT
                          (MOTIONS HEARING)
11
        APPEARANCES:
12
         For the Plaintiff:     DORSEY & WHITNEY LLP
13                              BY:  SHANNON L. BJORKLUND, ESQ.
                                     PAYTON E. GEORGE, ESQ.
14                                   R.J. ZAYED, ESQ.
                                     DONNA REUTER, ESQ.
15                              50 South Sixth Street, #1500
                                Minneapolis, Minnesota 55402
16

17       For the Defendant:     CHRIS EVANS FIRM LLC
                                BY:  CHRISTOPHER EVANS, ESQ.
18                              7260 E. Geddes Place
                                Centennial, Colorado 80112
19

20       Court Reporter:        RENEE A. ROGGE, RMR-CRR
                                300 South Fourth Street, Box 1005
21                              Minneapolis, Minnesota 55415

22
            Proceedings recorded by mechanical stenography;
23       transcript produced by computer.

24
                               *   *   *
25
```

```
 1                    P R O C E E D I N G S

 2          IN COURT VIA ZOOM VIDEO CONFERENCE

 3                        * * *

 4          THE COURT:  All right.  Good morning, everybody.

 5   I hope you can hear me okay.  Just wave if you can or nod.

 6   All right.  Good.  Thank you.

 7          For the record, this is Civil Case No. 20-1630.

 8   It is captioned Peakspeed, Incorporated, versus Timothy

 9   Emerson.

10          Let's have counsel note appearances today, first

11   for the plaintiff.

12          MS. BJORKLUND:  Good morning, Your Honor.  Shannon

13   Bjorklund of Dorsey & Whitney on behalf of plaintiff

14   Peakspeed, Incorporated.  Also with me is R.J. Zayed, Payton

15   George and Donna Reuter, also of Dorsey & Whitney.

16          I plan to argue the preliminary injunction motion,

17   and Ms. George plans to respond to the motion to dismiss.

18          THE COURT:  All right. Very well.  Thank you.

19   Good morning to all of you.

20          And for the defendant, please.

21          MR. EVANS:  Christopher Evans, Your Honor, of the

22   Chris Evans Firm representing Timothy Emerson.

23          THE COURT:  All right.  The court has read the

24   briefs today and is ready for argument here on the motion

25   for preliminary injunction and defendant's motion to dismiss
```

1    on jurisdiction grounds.  And so we'll -- I think we'll

2    focus primarily on the injunction, and then we'll turn in

3    the time remaining to the motion to dismiss.

4            So, Ms. Bjorklund, are you ready to proceed?

5            MS. BJORKLUND:  I am, Your Honor.

6            THE COURT:  Go right ahead.

7            MS. BJORKLUND:  Thank you.

8            This case is fundamentally about a power grab.

9    There's a modern day gold rush in the development of

10   orthorectification products that work on FPGA platforms.

11   Defendant Tim Emerson wants the product all to himself and

12   wants to shut out every other person who worked on and

13   invested in this product.  Dave Eaton invested over $150,000

14   in development of this product.  Six other employees devoted

15   their time and effort to developing this software using

16   hundreds of hours over a number of months, but now Tim

17   Emerson is trying to take everything for himself.  Not only

18   that, he is interfering with Peakspeed's operation.  He is

19   contacting Xilinx, a partner of Peakspeed, as well as

20   potential customers of Peakspeed to interfere with its

21   ability to develop business relationships.

22           Now, as the court knows, there's a four-step test

23   for a preliminary injunction.  I plan to focus on the

24   likelihood of success prong, because I think it's the most

25   fact intensive, but, of course, I'm happy to address any

1  questions on any of the other prongs as we go forward.

2          Your Honor, I would like to share a few slides,

3  just that I think will help focus this argument.

4          THE COURT:  That's fine.

5          MS. BJORKLUND:  So first let's focus on the facts

6  that are not in dispute here.

7          First, it is not in dispute that Tim Emerson

8  worked on the TrueView software in 2019, but it was not in a

9  deliverable format.  Along with him, Oscar Kramer and others

10  also worked on the software in 2019.

11          It is also undisputed that in 2019 Tim Emerson ran

12  out of money.  He and Dave Eaton agreed to form a new

13  company, which they titled Peakspeed.

14          It is also undisputed that Dave Eaton provided

15  over $150,000 of funding for this new operation to develop a

16  product that could be marketed and sold to a number of

17  different customers.

18          Mr. Emerson was not the only person who worked on

19  this source code, yet he claims all of it for himself.

20  Other than Mr. Emerson, there were six other people who

21  worked on this source code, devoting hundreds of hours

22  during 2020.  None of those individuals had a written

23  agreement to assign the intellectual property to EmersonAI,

24  Tim Emerson's LLC, which he now claims owns sole rights to

25  this source code.  All of those individuals believed that

1    they were working for and on behalf of Peakspeed in 2020,

2    and we have submitted declarations from them to that effect.

3            Now, Your Honor --

4            THE COURT:  Is it possible at this point,

5    Ms. Bjorklund, to assign some kind of percentage to

6    Mr. Emerson and what he did to -- to create this tangible

7    medium of expression or whatever we want to call it?

8            MS. BJORKLUND:  Your Honor, yes.

9            THE COURT:  He did work on it and was working on

10   developing the idea I think in 2019.  I'm not sure how far

11   he got.  But is it even possible at this point to identify

12   the extent of his contribution?

13           MS. BJORKLUND:  So I think there are -- there are

14   two issues there.  First of all, we've provided evidence on

15   the amount of source code, the percentage, that Mr. Emerson

16   had contributed, but percentage of lines of code isn't all

17   of it.  As illustrated in the declarations that we

18   submitted, Mr. Emerson's contribution related to certain

19   mathematical functions that are themselves not

20   copyrightable.  So regardless of the portion of code

21   assigned to Mr. Emerson, that does not mean he actually has

22   a copyrightable authorship interest in the code.

23           The second point is, as identified by Mr. Eaton's

24   declaration, Peakspeed has since removed those portions of

25   the code.  So as it stands today, in fact, there is nothing

1    from Mr. Emerson other than these -- these mathematical

2    functions.

3              The second point --

4              THE COURT:  Why was he brought on as chief

5    technological officer then?

6              MS. BJORKLUND:  So I believe that -- you know, I

7    can't pretend to go back in time and know what the parties

8    were thinking.  I think that they wanted to work together.

9    It was clear Mr. Emerson could not do this by himself.  He

10   had sought help from Mr. Kramer in 2019, but Mr. Kramer

11   would only give a limited number of hours per week.  But

12   with Dave Eaton's business advice and participation and

13   funding, now Tim Emerson had at his disposal several other

14   programmers he could work with who could execute the code,

15   as well as full-time assistance from Mr. Kramer.  So, you

16   know, regardless of whether everyone hoped that he would be

17   able to facilitate and develop the code, that's not

18   ultimately how it worked out.

19             The second point I would just like to note is that

20   for copyright and joint authorship each author has

21   independent rights.  So if Peakspeed is a coauthor, even a

22   joint author of the source code, it has the independent

23   right to market and license that code.

24             Now, there could potentially be a question with

25   joint authorship of accounting for, you know, royalty

1     agreements, but that is not an injunction-type question.

2     The question here is whether Peakspeed has the right to

3     market this code, and it clearly does.  It has at the very

4     minimum joint authorship interest, although we believe it is

5     the sole author of the code.

6               All right.  So, Your Honor, I would like to first

7     continue on and show you just a few documents that I think

8     that were submitted that particularly illustrate how this

9     all works.  So, again, I will share --

10              THE COURT:  Before we go to that, Ms. Bjorklund,

11    can you explain to me, because I wasn't entirely sure, the

12    FPGA code, which now is referred to I think as OrthoTop,

13    that Emerson worked on?  How does that relate to the rest of

14    the code that was written?  As I understand, this is part of

15    the copyrighted material.

16              MS. BJORKLUND:  So, Your Honor, there were two

17    copyright submissions.  One is OrthoTop, and the other is

18    TrueView.  I would caution that the names of these can be a

19    little misleading because, just like the iPhone, you know, a

20    product title doesn't necessarily mean a specific version.

21              Mr. Emerson testified in his deposition that the

22    OrthoTop was nearly a subset of the code that kind of

23    communicated with the FPGA and that he had removed portions

24    written by other individuals, we believe, although we

25    haven't seen because defendant has refused to produce the

1    code that he copyrighted as TrueView.  So, in fact, although

2    we have notice of a copyright registration, we in fact have

3    no idea what that actually covers, whether it is TrueView

4    portions as of late 2019, whether it is the entire product

5    as of July 3rd, which we don't believe he could truthfully

6    register as sole property of EmersonAI, or whether it's

7    something in between.

8            THE COURT:  All right.

9            MS. BJORKLUND:  All right.  So going back in time

10    to sort of think about how this Peakspeed entity was formed.

11    I'm sharing a document, which is Exhibit K to the

12    declaration of Payton George, and this is in November of

13    2019, so about a month and a half before Peakspeed was

14    joined, but when Emerson -- EmersonAI, LLC, was already in

15    trouble.  These are the defendant's own words.  Without the

16    Eatons, EmersonAI would not exist today.  When we switched

17    to a C corp, it would be a good time to recognize the

18    company as way more than Emerson.

19            So even prior to the foundation of Peakspeed,

20    Mr. Emerson is identifying that Dave Eaton has contributed

21    substantially to this and that when they transition to

22    Peakspeed it's going to be a project kind of worked on

23    together.

24            Let me actually show you -- sorry.  I'm having

25    trouble getting this PowerPoint to switch.

1           So the initial agreement, as Mr. Eaton identified,

2     is as follows.  So Mr. Eaton would supply funding, in this

3     case over $150,000, and Mr. Emerson would provide the assets

4     of EmersonAI, whatever those were, however valuable or not

5     those were, into Peakspeed.  In exchange, each would get a

6     third of Peakspeed and Mr. Emerson would get a salary.  Now,

7     I would note, as we've stated in our brief, Mr. Emerson drew

8     on his salary the first few months and then deferred it due

9     to cash flow issues.  It didn't eliminate the salary

10    obligation.  It was just a deferral.

11           What Mr. Emerson now contends is a reimagining of

12    this agreement.  Sorry.  He is contending that in fact he

13    contributed nothing to Peakspeed, no intellectual property

14    rights, no source code, nothing, but in exchange he would

15    get one-third of a share of Peakspeed, a salary for his work

16    and then license payments from Peakspeed for the TrueView

17    software, the very software that was developed by six people

18    with Dave Eaton's money, including work that Mr. Emerson

19    received a salary for performing.  Now, this is simply out

20    of touch with reality and cannot be the case.  This is the

21    only theory upon which EmersonAI, as he contends, could have

22    sole ownership of this copyright.

23           One other thing I would like to highlight that's

24    really brought out in our reply brief is the -- the -- maybe

25    hypocrisy is a strong word, but the inconsistent treatment

1    that defendant applies to himself and to Peakspeed.

2         So defendant claims that EmersonAI, an LLC, owns

3    the sole right to the copyright.  He also contends that

4    Peakspeed owns no right because there is no written

5    agreement, but it's undisputed that defendant has not

6    produced a single written agreement assigning any copyright

7    rights to EmersonAI.  So if defendant's logic is applied, at

8    most defendant has a partial authorship or joint authorship

9    and each of the other individuals, who all believe they were

10   working on behalf of Peakspeed, own other property.

11        Also brought out in Mr. Emerson's declaration, he

12   didn't work directly for EmersonAI, LLC.  Mr. Emerson worked

13   for what's called Emerson Consulting, which in turn worked

14   for EmersonAI, LLC.  This additional link in the chain

15   provides an interesting insight into, in defendant's view,

16   who has ownership of the different rights.  So let's look at

17   what Mr. Emerson testified in his deposition.

18        When I asked him who owns intellectual property

19   and work performed by Tim Emerson on behalf of Emerson

20   Consulting, he said Emerson Consulting owns the work.  Now

21   recall EmersonAI registered the copyright.  When I asked

22   essentially why, he said the work was done for EmersonAI, is

23   assumed to be EmersonAI property by Emerson Consulting.

24        So in defendant's view, when EmersonAI -- or

25   sorry -- when Emerson Consulting works for EmersonAI, the

1    property is assumed to belong to EmersonAI; but when Emerson

2    Consulting works for Peakspeed, he contends that the same

3    rule does not apply.

4        This same double standard also goes towards the --

5    what Mr. Emerson views as independent contractors who worked

6    on the source code.  According to Mr. Emerson, with an

7    independent contractor there is no assignment of rights

8    unless there is a written agreement.  And he contends that

9    the other individuals, like Oscar Kramer, Dave Zimmerman,

10   Dave Caliga and others, were working as independent

11   contractors.  Now, if that is the case, then EmersonAI does

12   not own their contributions.  It doesn't --

13        THE COURT:  So we don't know for sure at this

14   point whether there are any written agreements that apply to

15   the other people who worked on the source code, Kramer and

16   the others?

17        MS. BJORKLUND:  So Mr. Emerson has produced

18   agreements from 2019 with EmersonAI consult -- or EmersonAI,

19   LLC.  Those are consultant agreements, and they do not have

20   an independent or an intellectual property provision.

21        THE COURT:  All right.  Okay.  So no written

22   agreements concerning development of intellectual property?

23        MS. BJORKLUND:  Correct.  Correct.  As of

24   July 2020.

25        THE COURT:  Right.  Okay.  The -- if we assume for

1    a moment that Mr. Emerson's contributions to the source code

2    in 2019, before Peakspeed, were at least reasonably

3    significant, does Peakspeed have any right to the work that

4    was done in 2019?

5              MS. BJORKLUND:  Yes.

6              THE COURT:  Absent a written agreement.

7              MS. BJORKLUND:  Yes, they do.  For a couple of

8    different reasons.

9              So one is that when there is a substantial change

10   to a product -- I believe this is kind of counter to

11   defendant's argument about derivative works -- when there's

12   a substantial change to a product, then the joint authors of

13   that change have ownership.  And, again, as I mentioned, any

14   joint author has the right to market or sell or license a

15   copyright.  So for that reason, because there was a

16   substantial change as supported by Mr. Eaton and

17   Mr. Kramer's declarations, that is sufficient.

18             Second, as we identified through the work-for-hire

19   doctrine, and we're contending that all of these employees,

20   including Mr. Emerson, were working for Peakspeed as

21   employees in 2020, that would subsume the information

22   brought by Mr. Emerson.

23             Now, defendant cites a case *Oliver* in which a

24   court came to a different conclusion under different facts.

25   I would urge the court to look at the cases we cited,

1    including the *Marvel* case, which state that when something

2    is sort of ephemeral or in the very early sort of idea

3    phases, then when an employee brings that to work with them

4    that does not preclude their later fulsome development of

5    something from being a work-for-hire.  So under those two

6    theories it would be the case.

7            Finally, a third theory -- or not theory -- a

8    third point I would make is that Mr. Emerson was not the

9    sole person working on TrueView in 2019.  So was Oscar

10   Kramer, so were two or three other people, Patrick Losique

11   and so on.  And so Tim Emerson was not the sole owner even

12   as of that date.  Because those individuals worked for

13   Peakspeed, believed their work was for Peakspeed and

14   continue on with Peakspeed, Peakspeed as an entity,

15   including those individuals, has the right to market,

16   license and sell this invention -- or this copyright.

17           THE COURT:  You mentioned the -- I think you

18   called it the complete rewriting or the removal of those

19   earlier portions, the rewriting of the source code by

20   Peakspeed.  Is what Peakspeed has right now separately

21   registrable with the copyright office?

22           MS. BJORKLUND:  So, Your Honor, I believe it's

23   separately registrable.  I don't believe it's separately

24   registered at this point.

25           THE COURT:  Okay.  But it would be separately

1    registrable.  It's different enough to be able to be

2    copyrighted.

3            MS. BJORKLUND:  I would think that to be the case,

4    but I do need to candidly disclose I haven't studied that in

5    detail.

6            THE COURT:  And we know you haven't received the

7    source code itself, so --

8            MS. BJORKLUND:  We have not received the source

9    code that was registered, right, by EmersonAI as TrueView.

10           THE COURT:  Okay.  All right.

11           MS. BJORKLUND:  So defendant's current view is

12   really contrary to the facts as he understood them, even as

13   he understood them at the time.

14           So just, again, pointing out a couple of

15   documents, because I know the record is voluminous here.

16           In February of 2020, so after Peakspeed was

17   formed, while everybody was working together

18   collaboratively, in the course of sending these sort of

19   instant-message-type things, Tim Emerson said, Thanks for

20   putting that together; I also like the Peakspeed copyright,

21   referring to a new Peakspeed header on the source code that

22   said Peakspeed and copyright.

23           Also included, this -- this top document was

24   submitted as Kramer Exhibit C.  There's a better version

25   that allows you to see the Peakspeed code that we

1   inadvertently did not also submit, but is Exhibit 24 to

2   Mr. Emerson's deposition, and we can certainly submit if it

3   would help.

4           So in February of 2020 Mr. Emerson is well aware

5   that Peakspeed is claiming ownership of this code and in

6   fact supports that.

7           Likewise, in March of 2020 Mr. Emerson signs a

8   non-disclosure agreement, signs an agreement on behalf of

9   Peakspeed with its partner Xilinx, the very partner it's now

10  trying to interfere with, as its president and CTO.  So

11  although Mr. Emerson now claims he never worked for

12  Peakspeed, he never did anything as the CTO, that's contrary

13  to this written agreement that he signed as CTO with the

14  very entity with whom he's trying to interfere.

15          This is also inconsistent with the understanding

16  of every other person who was working on the project.  So

17  Joe Greshik -- we submitted a declaration, which is ECF 38.

18  He said, I've worked remotely for Peakspeed since

19  January 2020; all of my work since starting has been for

20  Peakspeed, none has been for EmersonAI.  Patrick Losique

21  said the same thing, working exclusively for Peakspeed.

22  Matthew Baldin said the same thing.

23          Oscar Kramer specifically submitted a declaration

24  that he joined a reconstituted, a new entity with Dave Eaton

25  at the helm.  He had previously provided consulting advice

1    to EmersonAI, but he was unwilling to leave his stable

2    salaried job with an established company to join an LLC that

3    was run by Mr. Emerson alone, and he only joined because it

4    was this new entity with this new funding and Dave Eaton was

5    at the helm.

6           Dave Zimmerman also submitted a declaration that

7    he was hired for Peakspeed and has never worked for

8    EmersonAI.  He first started working in 2020.

9           And David Caliga submitted a declaration saying he

10   has worked for Peakspeed since May of 2020.

11          So, again, every one was in agreement that they

12   were working for Peakspeed up until July of 2020 when

13   defendant decided he wanted to be a consultant, informed

14   Mr. Eaton of that fact, and then over the Fourth of July

15   holiday weekend logged in and changed the Peakspeed

16   copyright notations on the source code to EmersonAI,

17   contrary to what every other person working on the code had

18   understood to be the correct facts.

19          After this, as identified in our briefs, he locked

20   out the Peakspeed employees from various accounts and from

21   the servers.  And then he went further and started

22   affirmatively contacting Peakspeed's partner Xilinx and its

23   potential customers to interfere with the relationship by

24   falsely claiming that he has sole rights to the code.

25          THE COURT:  Can I -- can I just -- I'm still

1    trying to grapple with one part of this and try to

2    understand it.

3            TrueView consists of two codes.  Are they -- are

4    they stand-alone or are they interdependent parts of the

5    whole?  I mean, can either of them produce the intended

6    orthorectification by themselves, or do they need to be

7    working in conjunction with each other?

8            MS. BJORKLUND:  So I believe that they are two

9    components that work together, that one is maybe not

10   incorporated into, but sort of referenced by the other.

11   Does that make sense?

12           THE COURT:  Yeah.

13           MS. BJORKLUND:  The other thing to note is that,

14   you know, these products are developed for a specific FPGA

15   card; and as the technology progresses, the

16   orthorectification software has to be modified to work on

17   essentially different platforms or different types of, I

18   don't know, hardware or cards.

19           THE COURT:  Okay.  Good.  Thanks.  That's helpful.

20           MS. BJORKLUND:  So, Your Honor, I'm aware of the

21   court's time constraints.  And unless you have further

22   questions, I would --

23           THE COURT:  Okay.  That's fine.  Thank you,

24   Ms. Bjorklund.

25           Mr. Evans, do you wish to respond?

1          MR. EVANS:  I do, Your Honor.

2          I'd first like to note that every document that

3     they showed Your Honor was filed for the first time with

4     their reply, and we have objected to all of those new

5     exhibits and evidence as being improper since we have not

6     had an opportunity to address them and brief the court, and

7     we've asked the court to either ignore or strike those

8     exhibits.

9          THE COURT:  Yeah, I understand that.  I think

10    in -- normally in a summary judgment motion that would be a

11    very good argument.  Usually when we are dealing with a

12    preliminary injunction issue, the facts are a little bit

13    fast-moving and being developed.  And it's helpful I think

14    for the movant to have a chance to reply to what the

15    defendant comes up with in response, given the fact that,

16    you know, it's a little uncertain territory at the

17    beginning.

18         So I understand your objection, but I will take

19    them into account.  If there's anything that you need to

20    respond to further, you can ask for that.  So go ahead.

21         MR. EVANS:  I'm going to share with you slides

22    here with the court.

23         THE COURT:  All right.

24         MR. EVANS:  Bear with me while I figure out the

25    best way to do this.  Can Your Honor see my first --

1          THE COURT:  Yes.

2          MR. EVANS:  All right.  Thank you.

3          I just want to take us back to first principles

4   here.  Plaintiff has spent their entire -- well, pretty much

5   the entirety of their briefs and argument here trying to

6   disprove what EmersonAI owned, but that's not the issue

7   that's in front of the court.

8          The plaintiff has moved for affirmative relief to

9   have the court rule that they are the owner of the TrueView

10   source code.  That means it's their burden to demonstrate

11   copyright ownership, which means that they have to bring

12   forth proof that the TrueView source code is original and

13   can be copyrighted and that all statutory formalities have

14   been complied with.  They have not done so.  There has

15   been -- there is no source code in front of the court.

16   Defendant has not seen any source code.  Plaintiff has not

17   identified what source code it is that they believe they

18   own.  As they argued to you, they are not sure what

19   EmersonAI has copyrighted, but we don't know what they are

20   even arguing that they claim to own here.

21          So I think that's the first issue, especially when

22   they are asking the court to enter a preliminary injunction

23   on an expedited basis.  The thing they needed to do was

24   bring the source code to the court; and if they want to

25   argue that they own it, they need to demonstrate who the

1    authors of that source code is, how the authors of those

2    source code transferred the rights that they had to

3    Peakspeed, because obviously Peakspeed as a corporation

4    can't author anything itself, and then they have to prove

5    that that code is copyrightable.  So all their arguments

6    that EmersonAI hasn't proved that it owns the copyright or

7    that EmersonAI hasn't proved that its source code is

8    copyrightable are besides the point.

9         But EmersonAI does have a registered copyright,

10   which does give it a presumption that it owns the code it

11   says it does and that its code is copyrightable.  If they

12   want to overcome that, they have to prove that EmersonAI

13   does not own the code or that the code is not copyrightable,

14   but they have offered no proof to do that.  All they've

15   pointed to is its absence of evidence for EmersonAI proving

16   that it does own it, but that does not meet the burden that

17   they have to clear here.

18        The other problem is they are arguing about joint

19   authorship now too.  That seems to be their main thrust.

20   They seem to have given up on sole ownership of copyright.

21   But that too requires them to prove that the contributions

22   by each author were independently copyrightable and that the

23   authors intended that their contributions would be merged in

24   inseparable parts of a unitary whole.  There is no evidence

25   for either of those prongs at the joint authorship test.

1    Again --

2              THE COURT:  Well, we know, Mr. Evans, we know that

3    Oscar Kramer worked on the source code in 2019, probably in

4    2020 as well, and there wasn't a written agreement signed

5    with him that -- that he couldn't be a joint author.

6    What -- what do I make of that?  You know, how can Emerson

7    be the sole author when you have an additional author who

8    doesn't have a written agreement?

9              MR. EVANS:  Well, there are actually two written

10   agreements with Oscar Kramer.

11             We have not put all of our evidence in to prove

12   that EmersonAI owns its source code, because we have not

13   asserted any claims in this case and it is not -- we don't

14   have to prove anything.  All we have to do is disprove that

15   Peakspeed does own it.

16             But there are actually two written agreements with

17   Oscar Kramer.  There's a service provider agreement, and

18   there's a non-disclosure agreement.  Whether or not those

19   rise to the level of a transfer of authorship, that's a

20   factual issue that would probably need to be settled another

21   day, as would whether Oscar Kramer sufficiently contributed

22   to the source code to even be considered a joint author,

23   which again would be a factual issue that would need to be

24   addressed.

25             But that's not the issue that's before the court

1    today.  And if that's what they are hanging their hat on,

2    then they had the burden to bring that proof to prove that

3    Oscar Kramer did in fact contribute sufficient code to be --

4    to qualify as a joint author; and they haven't even shown

5    that if he was a joint author that he has transferred that

6    joint authorship or licensed Peakspeed to own the source

7    code.

8            So whether or not Oscar Kramer is a joint author,

9    that has no bearing on this because they are asking you for

10   a declaration that Peakspeed is the owner of the copyright

11   of the TrueView source code.  So their arguments are missing

12   the point entirely.

13           Sorry.

14           The other issue that I think I'd like to highlight

15   for the court here too is Peakspeed keeps changing its

16   story.  They've -- they keep telling you in briefs and in

17   declarations that Emerson was paid a salary by Peakspeed

18   from Peakspeed's business checking account, but in a

19   verified interrogatory response they responded Tim did not

20   receive a salary payment from the Peakspeed account.  So

21   they have admitted in an interrogatory that the Peakspeed

22   bank account never paid Tim Emerson that they keep telling

23   the court affirmatively in briefs that he did.  Mr. Eaton

24   admitted that in his deposition as well.

25           The other things they keep telling you are that

1   all of Emerson's assistants were paid directly by Peakspeed.

2   But, again, Mr. Eaton admitted in his deposition that all

3   the money that paid everyone who worked on TrueView went

4   from his personal bank account into the EmersonAI bank

5   account as a loan and then that EmersonAI bank account paid

6   invoices that were submitted to EmersonAI by each of these

7   employees and paid them directly out of its Wells Fargo Bank

8   account.

9          Peakspeed is not involved in that transaction at

10  all.  The only tenuous connection you have is that the loan

11  came from Peakspeed's CEO.  But loaning money to another

12  business, that doesn't make you an owner of anything and

13  that's different than saying Emerson's assistants were paid

14  directly by Peakspeed.

15         Most concerning is one of their entire claims

16  they've now admitted doesn't exist.  They accused Tim

17  Emerson of conversion of a $20,000 credit.  And in their

18  reply brief in a footnote they admitted, oh, that $20,000

19  credit doesn't actually exist, that credit was for actually

20  $2500.  Well, that's an entirely different thing that we've

21  never had a chance to respond to.  So I believe at this

22  point their conversion claim should be considered to have

23  been withdrawn, and they will need to replead that under the

24  correct -- a correct property that they are accusing Tim

25  Emerson of stealing.

1          Another issue they've had.  They are saying now --

2     well, they said in their opposition to the motion to

3     dismiss, when they say this circuitous method of disbursing

4     funds, that's Dave Eaton depositing money in the EmersonAI

5     bank account and then pay Tim Emerson Emerson Consulting

6     invoices, as well as the other employees -- well, I don't

7     want to say employees -- other people who worked on

8     TrueView.  That's what they are referring to here on the

9     left.  But he then submitted a declaration with his reply in

10    support of the preliminary injunction where he says all the

11    funds that he put into EmersonAI's account, that $150,000,

12    those were used to pay EmersonAI's operating expenses.

13    That's an admission that all of those salaries that were

14    paid to the people working on TrueView were EmersonAI

15    operating expenses.

16          The other -- another issue they are having is they

17    are arguing again in their motion for preliminary injunction

18    that Tim was just an employee hired by Eaton to be CTO, but

19    in their motion to dismiss Emerson is now a co-owner

20    responsible for forming the corporation, an agreed-to

21    partner with one-third ownership.  Those are not the same

22    thing.  So they are talking out of both sides of their

23    mouths, one for the preliminary injunction, one for the

24    motion to dismiss.

25          And, finally, they can't even get their story

1    straight on who worked on the code.  They told you in the

2    reply they filed last week -- they listed Oscar Kramer,

3    David Zimmerman, Joseph Greshik, Matthew Baldin, Patrick

4    Losique and David Caliga.  In their verified interrogatory

5    response they listed all the same people, except Tim Emerson

6    is included and Dave Caliga is excluded.  So, again, it is

7    not even clear who they are saying worked on or authored the

8    TrueView source code.  They can't even get that part of

9    their story straight.

10            And I would like to play just this video clip of

11   Dave Eaton, because I think this summarizes kind of Dave

12   Eaton's shifting position on facts in this case, in a

13   nutshell.

14            (Video recording is playing without sound.)

15            THE COURT:  I'm not hearing him.

16            MR. EVANS:  Sorry.  Hold on.  I may have to do

17   it -- I'm going to have to share this a different way.

18   Share.  Okay.  I think I can -- I think it should work now.

19   I'll start it over.

20            Thank you, Your Honor, for pointing that out.

21            Let me try this again.

22            (Video and audio recording is playing.)

23            All right.  Do you see this sentence where it says

24   Emerson was paid a salary by --

25                     (Recording stopped.)

1          MR. EVANS:  Is the audio working now, Your Honor?

2          THE COURT:  Yes.

3          MR. EVANS:  Thank you.

4          (Video and audio recording is playing.)

5          All right.  Do you see this sentence where it says

6    Emerson --

7                         (Recording stopped.)

8          THE COURT:  Now it went away.

9          MR. EVANS:  I'm sharing the wrong -- hold on.

10         Sorry, Your Honor.

11         THE COURT:  That's all right.

12         MR. EVANS:  This is my first Zoom hearing of any

13   type.  Do you see the video?

14         THE COURT:  Yes, I see the video.

15         MR. EVANS:  I'll see if the audio --

16         (Video and audio recording is playing.)

17         That statement is not true, is it?

18                         (Recording stopped.)

19         MR. EVANS:  Is the audio working?

20         THE COURT:  It was.

21         MR. EVANS:  Okay.  I'm going to proceed then.

22         (Video and audio recording is playing.)

23         Object to form.  Argumentative.  Mischaracterizes

24   prior testimony.

25         The funds to pay Tim and all the employees came

1  through the Peakspeed account as soon as that account was

2  able to provide those funds.

3          When you say the word "salary," doesn't that imply

4  a W-2 relationship with the company?

5          No.

6          Didn't we just establish that when you paid

7  Mr. Emerson you paid him from the Emerson -- well, you paid

8  him via Emerson Consulting, LLC, via the EmersonAI business

9  checking account?

10          Tim was paid compensation for his work as CTO from

11  my personal expenses, and those funds flowed through the

12  EmersonAI account until such time that those funds could

13  flow directly from the Peakspeed account.

14          So is it true that Emerson -- that Emerson was

15  paid a salary by Peakspeed from Peakspeed's business

16  checking account?

17          Asked and answered.

18          Yes.

19          You just -- I don't understand how that's true.

20  You just explained that the funds either came from your

21  personal checking account and flowed into EmersonAI's

22  business checking account, right?

23          Right.

24          So when was Emerson ever paid money from

25  Peakspeed's business checking account?

1            As I said, the Peakspeed checking account didn't

2    have the direct pay service enabled by -- or by Wells Fargo

3    until after Tim had elected to defer his income.  Previous

4    to that, when Tim was receiving a salary, that salary was

5    received from my personal funds through the EmersonAI

6    account.

7            So this statement in paragraph 10 that I'm

8    pointing at that says Emerson was paid a salary by Peakspeed

9    from Peakspeed's business checking account, that simply

10   isn't true, is it?

11           Object to form.  Argumentative.

12           Tim wasn't being paid a salary at this point

13   because he had elected to defer that salary.

14           Did you write your own declaration?

15           Yes, I did.

16           Did you write this sentence, Emerson was paid a

17   salary by Peakspeed from Peakspeed's business checking

18   account?

19           Object to form.

20           Yes, I wrote the whole thing, so I remember

21   writing this portion of it.

22           Did you just make a mistake when you wrote this

23   sentence?

24           I could have made this sentence more clear.

25           How would you rewrite it to make sure that the

1    court understood what is a hundred percent factually

2    accurate?

3              I would probably rewrite this something like Dave

4    Eaton paid Tim Emerson's salary during the last two months

5    of EmersonAI, along with the first months while he was being

6    paid a salary at Peakspeed.

7                        (Recording stopped.)

8              MR. EVANS:  Just a couple other points I would

9    like to make, Your Honor.

10             So, I mean, they're hanging their hat on Peakspeed

11   paying a salary to Tim Emerson, but the truth is, as Dave

12   Eaton has admitted, Peakspeed never paid Tim Emerson

13   anything.  David Eaton did loan money to EmersonAI.

14   EmersonAI was invoiced by Emerson Consulting, LLC, that was

15   invoicing for Tim's work.

16             The other thing to note is the last time Emerson

17   Consulting, LLC, was paid anything was on February 26, and

18   on that date it was paid $7,035 for work done by Tim from

19   February 3rd till February 14th.  That is the only payment

20   Tim Emerson -- that's the only money that has been paid for

21   Tim Emerson's work after Peakspeed was incorporated.  So

22   when they say Peakspeed paid Tim Emerson a salary, at best,

23   if you ignore the fact that that actually came from

24   EmersonAI to Emerson Consulting, they are talking about a

25   one-time $7,000 payment made in February.  That is not a

1    salary.  A salary is a reoccurring payment.

2          David Eaton has admitted that Tim Emerson is a

3    1099 employee, but he's not even a 1099 employee of

4    Peakspeed because he got paid by EmersonAI.  EmersonAI will

5    give Emerson Consulting a 1099 form at the end of 2020.

6    Peakspeed will not.  Every single employee at Peakspeed or

7    alleged employee at Peakspeed submitted invoices to

8    EmersonAI, got paid by EmersonAI and will receive 1099 forms

9    from EmersonAI in 2020.  They actually -- EmersonAI may

10   ultimately end up paying employment taxes for those

11   employees.  He's currently working with his accountant to

12   figure out whether or not he needs to, because they may

13   actually be full-time employees for him for which he is

14   responsible for their taxes.  I can't tell you affirmatively

15   one way or the other, because that's an issue that's still

16   being worked out right now.  But, regardless, Peakspeed will

17   not be paying, has not and will not pay employment taxes for

18   anybody that worked on TrueView.  Peakspeed has never paid a

19   salary to Tim Emerson.

20         And when they say that Tim Emerson, that that deal

21   they showed you -- hold on.  Let me share my -- do another

22   screen share, if I can.  I apologize for my --

23         THE COURT:  It's all right.

24         MR. EVANS:  This thing they showed you -- do you

25   see what I am showing you, Your Honor?

 1             THE COURT:  Not right now.

 2             MR. EVANS:  I need the screen share.

 3             All right.  So this slide she showed you where

 4    supposedly they're arguing that Tim didn't contribute

 5    anything, but got all this stuff, what happened in reality

 6    is Tim was -- there was an agreement that Tim was going to

 7    contribute things to Peakspeed and Peakspeed was going to

 8    provide Tim with shares and a salary.  Peakspeed never

 9    provided Tim with any shares.  That's undisputed.  And

10    Peakspeed at best, as we just discussed, made a one-time

11    $7,000 payment through EmersonAI to Emerson Consulting.

12             So their argument that Tim didn't contribute

13    anything to Peakspeed, that's because Peakspeed didn't

14    contribute anything back to Tim.  I mean, if there was a --

15    if there was supposed to be a deal, it never happened.  And

16    that's why we are here today.  We don't dispute that the

17    parties were going to be partners and that Peakspeed was

18    going to be the new entity that was going to take over from

19    EmersonAI.  That was what was supposed to happen.  The

20    problem is that entity never got properly set up.  None of

21    the agreements were put into place.  Intellectual property

22    was never transferred.  And then David Eaton fired Tim

23    Emerson on July 6th.  That's why we are here today, Your

24    Honor.

25             THE COURT:  The developers who worked in 2019 with

1    Mr. Emerson, they were all independent contractors, I

2    understand that, and they had service provider,

3    non-disclosure agreements.  Was there any written agreement

4    between any of them and EmersonAI concerning ownership of

5    the portions of the code that they may have or may not have

6    developed?

7                MR. EVANS:  It's not explicit, but there's case

8    law that says you don't have to explicitly spell it out.  I

9    think arguably the contract would have conveyed their rights

10   in the source code, but that -- I think that's also somewhat

11   besides the point.  Many of the developers were brand-new

12   college graduates who had never ever before programmed an

13   FPGA and were being mentored by Tim.  One was his nephew.

14   They contributed very little to the code that Tim was

15   writing.  He may have --

16               THE COURT:  Well, Kramer, Kramer contributed

17   something, and I think his service provider agreement

18   doesn't mention intellectual property at all.  Is there any

19   other written agreement between Kramer and EmersonAI that

20   bears on intellectual property?

21               MR. EVANS:  There's a non-disclosure agreement.

22   So when he was provided source code from EmersonAI, he was

23   required -- that was remained EmersonAI's property and he

24   was required to return it upon termination of his

25   employment.  Whether that counts as a transfer of his

1      intellectual property rights, again, I think that's an issue

2      that would need to be briefed and discussed further.

3              But there's also no evidence that Oscar Kramer

4      understood himself to be a joint author or intended to be a

5      joint author to merge anything into the whole, and he was

6      working part time, less than ten hours a week, sporadically.

7      He did not write that much code in 2019, and I'm not sure

8      how much, if any, of his code ultimately made it into the

9      TrueView version of the TrueView source code that EmersonAI

10     copyrighted.

11             THE COURT:  All right.  Thank you.

12             All right.  Ms. Bjorklund, do you wish to respond?

13             MS. BJORKLUND:  Yes, Your Honor.  I will be brief.

14             So I want to step back and look at this at a

15     10,000-foot view.  What did Dave Eaton get for his money?

16     According to defendant, nothing.  Right?  Defendant now

17     claims that Tim Emerson got nothing out of the agreement.

18     He contributed nothing and so he got nothing.  If that is

19     his position, that is one that sounds great to us, because

20     it means he would not be claiming all of Peakspeed's work in

21     2020 with all of the employees, nor would he be claiming the

22     Amazon Web Services account that Peakspeed had or any of the

23     other licenses paid for by Peakspeed.  That's simply not

24     what he's claiming.  He's claiming everything in exchange

25     for nothing.

1          Now, stepping back.  Defendant states that we have

2     a burden to prove that we own the copyright.  And I would

3     make two comments to that.  So first we have met that

4     burden.  We have supplied declarations from all of the

5     employees saying they understood they were working for

6     Peakspeed and working for hire implicitly.  We've provided

7     argument and evidence about the benefits they received, why

8     they should be considered employees and not independent

9     contractors, the core contributions of their work to the

10    work of Peakspeed and the fact that courts in the context of

11    a start-up sometimes look at formalities a little bit

12    differently.

13          Third, I'd like to just eliminate this red herring

14    of W-2s versus 1099s.  As the court is likely aware, those

15    documents are not even created for 2020 until January of

16    2021.  So there are no W-2s, there are no 1099s, but that

17    doesn't mean anything because those documents are not due

18    for another three or four months.

19          Now, I was surprised to hear Mr. Evans state that

20    there might be other intellectual property agreements that

21    would grant ownership to EmersonAI.  Isn't that primarily

22    what preliminary injunction discovery is about?  We

23    certainly sought that information.  During Mr. Emerson's

24    deposition I asked him about agreements, I asked him to

25    identify any intellectual property provisions, and he simply

1    couldn't.  And so Mr. Evans and defendant can't come in here

2    and now try to cast doubt based on the fact that they

3    decided not to produce documents during the course of

4    preliminary injunction discovery.

5              MR. EVANS:  Those documents were produced, Your

6    Honor, on September 7th.

7              MS. BJORKLUND:  Okay.  So is it your contention

8    then that there is a document?

9              MR. EVANS:  We were talking about NDAs, which are

10   not explicitly intellectual property agreements, so --

11             THE COURT:  Yeah, I think he's talking about the

12   non-disclosure agreement that he argues may -- may support a

13   transfer of ownership rights, if there are any ownership

14   rights.

15             MS. BJORKLUND:  Okay.  Your Honor, I would point

16   out that the non-disclosure agreement deals with a

17   non-disclosure obligation of any property owned by

18   EmersonAI.  It does not transfer rights in any property to

19   EmersonAI.  But I believe Your Honor can see that agreement

20   and decide for himself.

21             Just two more brief points.  I'd like to address

22   the idea of salary and the bank accounts.  As Mr. Eaton

23   testified, once the Peakspeed bank account was set up for

24   direct deposits, he did pay people through the Peakspeed

25   bank account.  The fact that Mr. Emerson had suspended or

1    deferred his salary at that point does not affect the

2    existence of Peakspeed.

3              And I think that -- that defendant focuses much

4    too heavily on the exact flow of -- of the money in this

5    situation.  So let me -- let me give a hypothetical that I

6    think will illustrate this point.  Let's say I hire a

7    babysitter for my two sons, and the babysitter wants to be

8    paid by check for tax documentation purposes, but I don't

9    have any checks in my checkbook.  If I give my neighbor $25

10   and the neighbor writes a check to the babysitter, that does

11   not mean the babysitter now works for my neighbor.  The

12   babysitter works for me, but the neighbor is facilitating

13   the transaction.

14             In the same way with Peakspeed, all of the

15   individuals were focused on the idea of getting the software

16   developed, getting the customers lined up.  The details of

17   the bank account was something that they put lower on the

18   priority list, and yet now defendant is trying to come back

19   and say that that is dispositive as to all of these other

20   issues.

21             And, finally, I'd say we certainly do not withdraw

22   our conversion claim.  The whole point is that the account

23   and the credit were converted by defendant.  Therefore, we

24   did not have access.  We provided the best information we

25   had at that point.  It turns out that the information is

1    different.  And as Your Honor noted, preliminary injunction

2    discovery can be fast-moving.  And so we appropriately noted

3    that it's a different sum of money.  This is entirely

4    ordinary in the course of discovery, and we do not withdraw

5    that claim.

6              THE COURT:  All right.  Let's turn to the other

7    motion.  Mr. Evans, you want to make argument on your motion

8    to dismiss?

9              MR. EVANS:  Yes, Your Honor.  I'll be brief.

10             The motion to dismiss -- EmersonAI -- or Peakspeed

11   is claiming that Tim is subject to specific personal

12   jurisdiction here in Minnesota.  That requires them to show

13   contacts that Tim had with the state that are tied directly

14   to one of the claims that are asserted in this lawsuit.  The

15   only claims at issue in this lawsuit are declaratory

16   judgment that they own a copy -- that they own the copyright

17   to TrueView, the declaratory judgment that they have the

18   right to use TrueView and the Computer Fraud and Abuse Act

19   based on the AWS account revocation from -- that Tim made

20   from various people and then the conversion claim based on

21   what was a $20,000 credit and now is apparently a $2500

22   credit that was also in the AWS account.  So the copyright

23   claims don't really turn on any specific contacts at all.

24   The copyright ownership is based on agreements and

25   employment.  They haven't alleged anything really that Tim

1    did in Minnesota that ties directly to either of those.

2         Tim worked -- Tim's lived in Colorado since 1988.

3    He works from home.  At all times he's only been paid from a

4    Wells Fargo Colorado branch bank account from EmersonAI to

5    Emerson, LLC.  There simply aren't any direct connections to

6    Minnesota for Tim.  He's never traveled there for work.  He

7    hasn't dealt with any customers there.  The only contacts

8    he's had that they've alleged are sporadic or -- I guess

9    sporadic is not the right word -- contacts with Dave Eaton

10   and David Zimmerman, who happen to live in Minnesota, that

11   were undertaken as part of the course of business just in

12   operating the companies, because they were working together.

13        THE COURT:  Well, let me ask you a question,

14   Mr. Evans.  When Mr. Emerson registered TrueView, obviously

15   he knew that Peakspeed was claiming an ownership interest in

16   TrueView and a right to use the code.  You know, whether

17   they did or not is a question I guess for this lawsuit.  But

18   Peakspeed was headquartered in Minnesota, would suffer

19   injury in Minnesota as a result of the registration.  How is

20   that not conduct that's knowingly aimed at the State of

21   Minnesota?

22        MR. EVANS:  Two things.  EmersonAI registered the

23   copyright, not Tim Emerson personally.  If they wanted to

24   sue EmersonAI, they could have.  Obviously, they are well

25   aware of EmersonAI and EmersonAI's role, but they did not.

1    They chose to sue Tim Emerson.  To attribute an action from

2    EmersonAI to Tim Emerson would require some sort of veil

3    piercing theory, which they have not put forward.

4         That would also fall under the fiduciary shield

5    doctrine, because any acts that Tim took on EmersonAI's

6    behalf or done as an executive for EmersonAI.  They have not

7    cited to any cases or made any arguments to overcome the

8    fiduciary shield doctrine.  They cited to one 2013 District

9    of South Dakota case that did not overturn that case,

10   because it's an Eighth Circuit case that established that it

11   cannot, simply distinguished it.  This court has since that

12   2013 case twice cited the fiduciary shield doctrine in

13   cases, the -- what is it -- the *Jacobs Trading, LLC*, and

14   *Blue Zones, LLC*, both of which are cited in my briefs,

15   affirmatively cited to the fiduciary shield doctrine.

16        So everything they accuse Tim of doing was either

17   done as Tim acting as an officer for Emerson Consulting,

18   LLC, EmersonAI, LLC, or, if they are to be believed, as in

19   his role as CTO of Peakspeed.  It doesn't matter which role

20   you pick.  Either way the fiduciary shield doctrine would

21   apply.  They haven't alleged any contacts between Tim

22   Emerson personally directed to the State of Minnesota.

23        And I'd like to share one more slide.

24        So in their brief the only thing they've argued to

25   connect their claims to Minnesota is that Tim knew that

1    Peakspeed would be injured in Minnesota, but then on the

2    very next page they cite that Emerson's mere knowledge that

3    Peakspeed would be harmed in Minnesota is insufficient.  So

4    they have themselves proved that their claims are not

5    sufficient.  It is not enough to just know that something

6    would be felt in Minnesota.  You have to purposely direct

7    acts towards Minnesota, which Tim has never done.

8              THE COURT:  All right.  Thank you, Mr. Evans.

9              Ms. George, I believe you're responding to this

10   one.

11             MS. GEORGE:  Thank you, Your Honor.  Good

12   morning -- or afternoon now, I guess.  Can you hear me all

13   right?  I just want to double-check, since I haven't spoken

14   yet.

15             THE COURT:  I can.

16             MS. GEORGE:  Perfect.  All right.

17             So defendant argues that, you know, the only

18   claims in this case are declaratory judgment for the

19   ownership or right to use TrueView, claims under the

20   Computer Fraud and Abuse Act and claims for conversion and

21   that Peakspeed has not alleged anything to support any

22   contacts or sufficient contacts between Mr. Emerson and

23   Minnesota.  But, I mean, the arguments he raises is just an

24   attempt to minimize and mischaracterize his relationship

25   with the Minnesota-based Peakspeed, and they ignore the

1    significant activities that he directed to the State of

2    Minnesota as well as the benefits that flowed to him from

3    the State of Minnesota.

4           For purposes of the jurisdictional inquiry,

5    Peakspeed only needs to make a prima facie case showing

6    personal jurisdiction exists, and this is a burden that

7    Peakspeed has met.  Peakspeed must allege sufficient facts

8    to support a reasonable inference that defendant can be

9    subject to jurisdiction in Minnesota, and the evidentiary

10   support that Peakspeed asserts on this point must be viewed

11   in the light most favorable to Peakspeed.  Peakspeed doesn't

12   contend that the court has general personal jurisdiction

13   over Mr. Emerson.  Peakspeed has plainly established that

14   there is specific personal jurisdiction over Mr. Emerson.

15          In order for a court to exercise specific

16   jurisdiction, the suit must arise out of or relate with

17   defendant's contacts with the forum.  And there are three

18   specific categories of key facts that support a finding of

19   specific personal jurisdiction here.

20          First, Mr. Emerson, as we've discussed at length

21   today, was employed and worked for Peakspeed, a corporation

22   that was and is operating out of Minnesota, and he, thus, as

23   CTO and employee, directed several actions into the State of

24   Minnesota.

25          Second, Mr. Emerson was paid or grew EmersonAI

1    from Minnesota-based bank accounts for both Mr. Eaton and

2    Peakspeed for his work on the source code at issue.

3            And, third, alternatively, under the *Calder*

4    effects test, defendant intended to harm a Minnesota-based

5    company by interfering with Peakspeed's access to the use of

6    its source code to servers that stored Peakspeed's

7    proprietary information and to Peakspeed's ownership of a

8    credit from Amazon Web Services.

9            THE COURT:  Let me ask you a question, Ms. George,

10   about the server computer.  I think the record shows that

11   Dave Eaton in his deposition said that the server computer

12   was actually owned by EmersonAI or by Tim, but may be rented

13   by Peakspeed?  I'm not entirely sure.  Is there any written

14   agreement concerning the relationship of Peakspeed to the

15   server computer that's at the heart of the Consumer Fraud

16   Act claim?

17           MS. GEORGE:  I don't believe that there are any

18   written agreements regarding the use of the server; rather,

19   it was kind of an implied use that Tim brought this server

20   and worked with the other Peakspeed employees to develop

21   code that was stored on the server, and then Peakspeed's

22   employees' use of that code that they had worked to develop

23   that was stored on the servers was interrupted by

24   Mr. Emerson locking the other employees out.

25           THE COURT:  Was anyone at Peakspeed, besides

43

1    Emerson, ever a primary account administrator on the server?

2            MS. GEORGE:  Primary account administrator.  I

3    don't believe so, but other employees had access obviously

4    to the code and could edit it.

5            THE COURT:  Yeah, they obviously all had access.

6    It's a question of whether they were an account

7    administrator.  I know that Emerson was.  But there's no

8    evidence anyone else was at this point?

9            MS. GEORGE:  No, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           MS. GEORGE:  So I guess I'll start with kind of

12   that first category of facts that I mentioned regarding

13   Mr. Emerson's direct connections to the State of Minnesota.

14           So, first, as you stated earlier, Peakspeed is

15   operating out of Minnesota.  It's where its CEO, David

16   Eaton, is located and where he's establishing business

17   relations and an operating location for Peakspeed.

18   Additionally, Peakspeed's vice president of engineering,

19   David Zimmerman, is also located in Minnesota.

20           And earlier this year defendant accepted the role

21   as Peakspeed's CTO and began publicly holding himself out as

22   such.  He had near constant communications with Peakspeed's

23   leaders in Minnesota.  So these are communications directed

24   to the state.  These were daily telephone calls, chat

25   messages, like instant messages through platforms such as

1    Microsoft Teams, email communications that were sent to

2    Minnesota.  And, I mean, I think ultimately defendant held

3    himself out to others publicly as the CTO of a

4    Minnesota-based company.

5            And I'll share this again, but I think it's been

6    shared several times today, if I may, the non-disclosure

7    agreement that Mr. Emerson signed on behalf of Peakspeed.

8    It's between Xilinx, Inc., a partner, and Peakspeed with

9    principal offices located in Excelsior, Minnesota, signed by

10   defendant Timothy Emerson as president and CTO of Peakspeed.

11           Defendant also accessed Peakspeed's proprietary

12   information in his role as CTO.  And, I mean, contrary to

13   defendant's argument that the performance of corporate or

14   employment duties is not enough to establish jurisdiction,

15   he's not cited a single case in which an employee was sued

16   by his former employer and the employer's state of operation

17   based on actions taken by the employee while employed.  He's

18   not cited a single case where a court has found that a

19   remote employee communicating with other employees in the

20   forum state were deemed incidental and insufficient to

21   support personal jurisdiction.

22           This case -- defendant's position as CTO of a

23   company operating in Minnesota is not being used to form the

24   basis of jurisdiction or a lawsuit by a random third party.

25   It's the basis for a suit by a Minnesota company related to

1   proprietary information that defendant worked on for that

2   company.  It arises out of and relates to defendant's

3   contacts with Minnesota as the CTO of Peakspeed, and it

4   satisfies Supreme Court precedent related to specific

5   jurisdiction.

6           Another connection between defendant and Minnesota

7   are the benefits that flowed from Minnesota to him.  So as

8   we've discussed earlier, defendant was the sole member and

9   owner of EmersonAI, LLC, which received substantial funds

10  from Minnesota bank accounts, from the personal bank account

11  of David Eaton as well as, once it was set up, the bank

12  account of Peakspeed, both set up in Minnesota, and

13  substantial sums of money flowed from both to defendant as

14  the sole member of EmersonAI in Colorado.  Before defendant

15  deferred his salary, he was even receiving salary and health

16  care expenses channeled from Minnesota from David Eaton's

17  Minnesota bank account.  These contacts are directly related

18  to the claims at issue, especially Peakspeed's request for

19  declaratory judgment regarding the ownership of the TrueView

20  software.

21          I think one of the key cases that we cite in our

22  briefing is the *Travel Leaders Leisure Group versus Travel*

23  *Experts* case, which found that a remote employee was

24  sufficiently connected to Minnesota or a finding of specific

25  personal jurisdiction in a lawsuit by his employer.  Like

1    the defendant in *Travel Leaders*, defendant held a leadership

2    position at Peakspeed, held himself out publicly as a CTO

3    and had nearly daily, if not daily, communications with the

4    rest of the Minnesota-based leadership team.  He was also

5    intimately knowledgeable about Peakspeed's proprietary

6    information and the use of which is at the heart of this

7    dispute.

8         And as Your Honor noted, the registration of --

9    defendant's registration of the TrueView software, while it

10   was authored -- it says it's authored by EmersonAI.  If I

11   could just share my screen one more time.  So this is

12   Exhibit 7 from defendant's opposition to plaintiff's motion

13   for preliminary injunction, and it is a copy of the

14   certificate of registration for TrueView.  It notes that

15   rights and permissions are granted to Timothy Emerson.  So

16   he's using this source code that is relevant to a Minnesota

17   company in his capacity both as the sole member of

18   EmersonAI, as well as a permitted user of this copyright.

19   Sorry.  I just realized that I was not sharing that at all,

20   but here's a copy of the registration, noting that the

21   author is EmersonAI with granting rights and permissions to

22   Timothy Emerson.

23        I'll just try to keep this brief here.  I think,

24   just to conclude, in the event the court is not inclined to

25   find that personal jurisdiction is proper in Minnesota,

1    Peakspeed would respectfully request that this case be

2    transferred to the District of Colorado.  Transfer is

3    appropriate in situations where it serves the interests of

4    justice to do so.  And here the interests of justice to

5    transfer this case to the District of Colorado, rather than

6    dismissing it outright, would be met.  As Peakspeed's

7    preliminary injunction makes clear, Peakspeed is moving as

8    quickly as possible to protect and resolve this issue

9    regarding its intellectual property and having to start

10   again from square one would cause further irreparable harm

11   to Peakspeed.  And, additionally, at this point in time both

12   parties have expended significant resources getting this

13   case to the point it is by engaging in expedited discovery,

14   and it would be prejudicial to both parties to have to start

15   again from the beginning.

16            THE COURT:  All right.  Anything else, Ms. George?

17            MS. GEORGE:  I think that's it for me, unless you

18   have any further questions.

19            THE COURT:  No.  That's fine.  Thank you.

20            Mr. Evans, do you have any brief reply?

21            MR. EVANS:  I do.  I'd like to talk about the

22   *Travel Leaders Leisure Group* case that she cited.

23            There was actually two tranches of defendants in

24   that case.  One was named Bowman or Baumann, B-A-U-M-A-N-N.

25   He was found to have -- be subject to specific personal

1   jurisdiction in Minnesota.  But to distinguish him from Tim,

2   he was found to have traveled to Minnesota to use an office

3   that the company provided there.  He was issued hardware and

4   software from that company's Minnesota office.  He was found

5   to have misappropriated trade secrets that were located in

6   that Minnesota office and take them back to California and

7   provide them to a third party.  So in that case there was a

8   theft of Trade Secrets Act claim at issue and the theft

9   occurred in Minnesota, tieing Bowman or Baumann to

10  Minnesota.

11          I contrast the other employees in that case were

12  found to not be subject to personal jurisdiction in

13  Minnesota.  And these -- this is a case where remote

14  employees working for a Minnesota company were found to not

15  be subject to specific personal jurisdiction in Minnesota,

16  and those employees had worked for the company for

17  twelve years.  They were paid -- there's no dispute that

18  they were paid salary, bonuses and health care benefits,

19  which were administered from Minnesota.  They were issued

20  hardware and software from Minnesota.  They connected to

21  Minnesota-based computer networks to do their jobs and were

22  provided access to trade secrets, but were found to not have

23  misappropriated them because they received them from

24  Baumann.  So just like this -- those employees have far more

25  contacts with Minnesota and a Minnesota-based employer than

1    Tim Emerson has been accused of having here.

2         And I still have not heard any argument to

3    overcome the fiduciary shield doctrine, but I've heard a lot

4    of argument about what Tim did or did not do as a CTO for

5    Peakspeed.  So, again, I believe all of those allegations

6    about Tim in his capacity as CTO for Peakspeed cannot be

7    considered for jurisdictional purposes because of the

8    fiduciary shield doctrine.  And none of the other grounds

9    that they've alleged or contacts they allege have ever been

10   found to be sufficient to hold somebody specifically

11   personally -- subject to personal jurisdiction in Minnesota.

12   That being said, we do not oppose a transfer to Colorado.

13        THE COURT:  All right.  Thank you, Mr. Evans.

14        Thank you, counsel, for your arguments today.  The

15   court will take both motions under advisement, and we will

16   issue a written order just as quickly as possible.  I

17   appreciate all of you participating by video conference

18   today.  Thank you.

19        We'll be in recess.

20        (Court adjourned at 12:20 p.m., 10-15-2020.)

21                      *   *   *

22        I, Renee A. Rogge, certify that the foregoing is a

23   correct transcript from the record of proceedings in the

24   above-entitled matter.

25        Certified by:  /s/Renee A. Rogge
                          Renee A. Rogge, RMR-CRR