## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PEAKSPEED, INC.,

                            Plaintiff,

v.

TIMOTHY EMERSON,

                            Defendant.

Civil No. 20-1630 (JRT/BRT)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANT'S MOTION TO DISMISS**

Shannon L. Bjorklund, Payton E. George, Donna Reuter, Forrest Tahdooahnippah, and R. J. Zayed, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN, for plaintiff.

Christopher Liimatainen Evans, **CHRIS EVANS FIRM LLC**, 7260 East Geddes Place, Centennial, CO 80112; and Dawn C. Van Tassel, **VAN TASSEL LAW FIRM**, 2909 South Wayzata Boulevard, Minneapolis, MN 55405, for defendant.

Plaintiff Peakspeed, Inc. ("Peakspeed") alleges that it has the exclusive right to own and use the copyright to the source code of a computer program, TrueView, and that Defendant Timothy Emerson has no such right. Peakspeed also alleges that Emerson impermissibly locked it out of servers and a cloud computing account, and that Emerson converted its property. Peakspeed has filed a Motion for a Preliminary Injunction, asking the Court to enjoin Emerson from claiming ownership of the source code and from interfering with or challenging Peakspeed's right to own and use the source code. Peakspeed also seeks an order restoring Peakspeed's access to the cloud account and

destroying all copies of the source code.  Emerson filed a Motion to Dismiss for lack of personal jurisdiction.

Because Peakspeed has made a prima facie showing of jurisdiction, the Court will deny Emerson's Motion to Dismiss.  Additionally, because the facts presented thus far demonstrate that Peakspeed and Emerson are likely joint authors of the source code, the Court will grant Peakspeed's Motion for a Preliminary Injunction enjoining Emerson from interfering with and challenging Peakspeed's right to own and use the source code. Because Emerson is likely a joint author of the source code and the sole administrator of the cloud account, the Court will deny Peakspeed's Motion in all other respects.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. EMERSONAI

##### 1. Beginnings

In early 2019, Emerson started EmersonAI to develop geospatial applications for Field Programmable Gate Arrays ("FPGAs").  (1st Decl. of Timothy Emerson ("1st Emerson Decl.") ¶¶ 8, 12, Aug. 28, 2020, Docket No. 24.)  Emerson was particularly interested in developing applications for Xilinx's next-generation hardware, the Versal Adaptive Compute Acceleration Platform ("ACAP"), because the ACAP uses both an FPGA chip and

a more traditional Central Processing Unit ("CPU") chip.[1] (*Id.* ¶¶ 12–15.) Emerson negotiated a Development and Marketing Agreement with Xilinx on March 22, 2019. (*Id.* ¶¶ 15–16.)

Emerson opened a bank account, in the name of EmersonAI, at a Wells Fargo branch in Colorado. (*Id.* ¶ 11.) Seeking a business advisor, he met with Dave Eaton, and Eaton orally agreed to manage the business with the expectation that he would gain an ownership interest in EmersonAI or EmersonAI's successor. (*Id.* ¶¶ 43–46.) Eaton was added to EmersonAI's bank account so that he could pay bills and make deposits. (*Id.* ¶ 51.)

### 2. TrueView

EmersonAI's main focus was developing a particular geospatial application, TrueView. (*See id.* ¶ 55.) Oscar Kramer was brought on as an independent contractor in May 2019 to help write its source code. (2nd Decl. of Oscar Kramer ¶ 22 ("2nd Kramer Decl."), Oct. 8, 2020, Docket No. 47.) Kramer brought decades of experience working with aerial imaging and developing orthorectification software to run on FPGAs. (*Id.* ¶¶ 3–9.)

---

[1] FPGAs are much faster than CPUs, as FPGAs can be designed for a single purpose, whereas CPUs serve multiple purposes at the same time. Geospatial applications require high-speed processing to correct spatial distortions in satellite imagery and aerial photographs due to topography, the tilt of the camera, and the shape of the earth. (Compl. ¶¶ 11–17, July 24, 2020, Docket No. 1.)

His contract said nothing about who would own the intellectual property developed by Kramer while consulting for EmersonAI.[2]  (*Id.* ¶ 23.)

TrueView's source code would consist of two parts: a host processing code, which would run on a traditional CPU, and an FPGA code.  (2nd Decl. of Timothy Emerson ("2nd Emerson Decl."), Ex. 1 ("Emerson Depo.") at 24:8–10, Oct. 1, 2020, Docket No. 35-1.) Kramer worked on the CPU host programming code.  (2nd Kramer Decl. ¶¶ 24–25.) Emerson worked on the FPGA code.  (Emerson Depo. at 97:12–98:7.)  At this time, Kramer began to write "property of EmersonAI" in the copyright header of TrueView's source code.  (*See id.* at 99:6–7.)

In September 2019, a prototype of TrueView was completed, which could run on Xilinx's current-generation hardware, the U250, but not on the next-generation ACAP hardware.  (*See* 1st Emerson. Decl. ¶¶ 57–58, 60; 2nd Emerson Decl., Ex. 10, Oct. 1, 2020, Docket No. 35-10.)   By late December, TrueView could also run on a specific FPGA platform, the F1 instance, though it was slower than the U250 version.  (1st Emerson Decl. ¶¶ 62–64; 2nd Emerson Decl. ¶ 3, Ex. 3, Oct. 1, 2020, Docket No. 35-3.)

---

[2] EmersonAI also engaged Matthew Baldin and Joe Greshik as independent contractors in, respectively, May and August 2019.  (1st Emerson Decl. ¶¶ 34–35, 38.)  Patrick Losique came on as an independent contractor in December 2019.  (Decl. of Patrick Losique ¶ 2, Oct. 1, 2020, Docket No. 39.)  Baldwin and Greshik served primarily to help Kramer and Emerson, and Losique did not work on TrueView.  (2nd Decl. of Timothy Emerson ("2nd Emerson Decl."), Ex. 1 at 99:24–100:12, 101:18, Oct. 1, 2020, Docket No. 35-1.)  As disclosed at the motion hearing, Baldin, Greshik, and Losique also signed agreements that did not expressly state who would own intellectual property developed by them as independent contractors.

### 3.  The End

EmersonAI always struggled financially, however.  (*See* 2nd Decl. of Dave Eaton ("2nd Eaton Decl.") ¶ 2, Oct. 8, 2020, Docket No. 46; *see also* Decl. of Donna Reuter ("Reuter Decl.) ¶ 4, Ex. 3 ("Eaton Depo.") at 34:23–35:14, Oct. 1, 2020, Docket No. 43-3.)  Emerson had only contributed $3,100 and some computer equipment to the company, (Decl. of Payton George ("George Decl.") ¶ 4, Ex. C ("Emerson Tr.") at 38:18–39:3, Oct. 8, 2020, Docket No. 48-3), and any money derived from the Xilinx agreement came in sporadically, (Emerson Tr. at 36:18–25.)  As a result, Eaton had twice injected personal funds into EmersonAI to keep it afloat in 2019: $10,000 in May,[3] and another $25,000 in mid-December.[4]  (2nd Eaton Decl. ¶ 5, Ex. A at 3, 6, Oct. 8, 2020, Docket No. 46-1; *see also* Reuter Decl. ¶ 9, Ex. 8 at 2, Oct. 1, 2020, Docket No. 43-8.)

Thus, by the end of 2019, Eaton wanted to start a new company to further develop TrueView.  (*See* Eaton Depo. at 232:17–24.)  Eaton and Emerson verbally agreed to form and equally own Peakspeed.  (1st Emerson Decl. ¶ 68.)  Eaton believed that Emerson agreed to contribute any interest he had in TrueView in exchange for his ownership share.[5]  (*See* 2nd Emerson Decl., Ex. 8 at 7, Oct. 1, 2020, Docket No. 35-8.)

---

[3] Eaton paid himself back $7,000 of the $10,000 in July 2019.  (Emerson Tr. at 43:7–9).

[4] The funds were used to cover EmersonAI's operating expenses and payroll.  (2nd Eaton Decl. ¶ 4; 1st Emerson Decl. ¶ 29, Ex. 5, Aug. 28, 2020, Docket No. 25-5.)

[5] By July 2020, when Emerson and Peakspeed parted company, no shares had yet been allocated. (2nd Emerson Decl., Ex. 2 ("Eaton Tr.") at 161:14–19, Oct. 1, 2020, Docket No. 35-2.)

**B. PEAKSPEED**

**1. Incorporation**

The transition from EmersonAI to Peakspeed began in early 2020.[6] (*See* Emerson Depo. at 80:18–20.) Eaton would be Chief Executive Officer of Peakspeed, Emerson its Chief Technology Officer ("CTO"), and Dave Zimmerman would be Vice President of Engineering. (*See* Compl. ¶¶ 9, 26, July 24, 2020, Docket No. 1; 1st Emerson Decl. ¶ 72.) Kramer, who had stopped consulting for EmersonAI in December 2019, emailed Eaton to inquire about joining Peakspeed; Kramer then came aboard as Chief Geospatial Scientist.[7] (2nd Kramer Decl. ¶¶ 29–31, 36.)

On January 30, 2020, Emerson sent an email to Zimmerman saying that Peakspeed should let their business partners know that EmersonAI was reorganizing from an LLC to a C-corp.[8] (George Decl. ¶ 2, Ex. A, Oct. 8, 2020, Docket No. 48-1.) Peakspeed was incorporated the next day, on January 31, in Delaware, (2nd Emerson Decl., Ex. 5, Oct. 1, 2020, Docket No. 35-5), with its principal place of business in Minnesota, (Compl. ¶ 5;

---

[6] As Kramer put it, Peakspeed was to become a reconstituted EmersonAI with Eaton now at the helm. (2nd Kramer Decl. ¶ 36.)

[7] Eaton had approached Kramer in October 2019 to inquire about his future involvement in the TrueView project and invited Kramer to join the project full time once the new company was established. (*Id.* ¶ ¶ 26–27.) Kramer would not have joined the project if Peakspeed was not poised to replace EmersonAI. (*Id.* ¶¶ 34–35, 37.)

[8] Back in November 2019, Emerson told Eaton that when "we switch to a C-corp, it would also be a good time to recognize that the company is way more than Emerson, so we should entertain a new name." (George Decl. ¶ 12, Ex. K, Oct. 8, 2020, Docket No. 48-11.)

Decl. of David Zimmerman ¶ 9, Oct. 1, 2020, Docket No. 41.)  The TrueView coding team, with the exception of Emerson, now considered themselves to be working for Peakspeed, not EmersonAI.[9]  (*See e.g.*, Decl. of Joe Greshik ¶¶ 3–4, Oct. 1, 2020, Docket No. 38.)

## 2.  From EmersonAI to Peakspeed

From February to July 2020, Peakspeed gradually took EmersonAI's place.  In late February, Kramer referred to TrueView as a product of "EmersonAI/Peakspeed" when promoting it.  (1st Emerson Decl. ¶ 71.)  At the same time, "Peakspeed" was inserted into the copyright header of TrueView's source code in place of EmersonAI, and Emerson applauded this.[10]  (Reuter Decl. ¶ 7, Ex. 6, Oct. 1, 2020, Docket No. 43-6.)  Then, Emerson, as President and CTO of Peakspeed, signed a non-disclosure agreement with Xilinx on March 7, 2020.  (Reuter Decl. ¶ 8, Ex. 7, Oct. 1, 2020, Docket No. 43-7.)  Emerson also renewed EmersonAI's Xilinx license in Peakspeed's name on March 17.  (Reuter Decl. ¶ 14, Ex. 13 at 1, Oct. 1, 2020, Docket No. 43-13.)

---

[9] Kramer, Zimmerman, and the rest of the coding team continued to be paid out of EmersonAI's bank account during the first half of 2020.  (1st Emerson Decl. ¶ 29, Ex. 5 at 2–3, 5–7.)  Almost all this money came from Eaton's personal funds: $50,000 sent directly from Eaton to EmersonAI's bank account, and most of another $109,000 sent via Peakspeed's bank account.  (2nd Eaton Decl. ¶ 3; *Id.* ¶ 5, Ex. A at 10, Oct. 8, 2020 Docket No. 46-1; 2nd Eaton Decl. ¶ 6, Ex. B ("Peakspeed Account") at 3, 6, 10, 13, 17, Oct. 8, 2020, Docket No. 46-2.)  This arrangement continued until June 2020, when the coding team began to be paid directly from Peakspeed's bank account.  (Peakspeed Account at 17.)

[10] Around May or June 2020, Eaton noticed that Peakspeed had entirely displaced EmersonAI in the copyright header.  (2nd Emerson Decl., Ex. 2 at 254:19–255:10, Oct. 1, 2020, Docket No. 35-2.)

Invoices for the Amazon Web Services ("AWS") cloud account, opened in 2019 in EmersonAI's name and administered solely by Emerson, (2nd Emerson Decl., Ex. 2 ("Eaton Tr.") at 155:11–16, 157:10–17, Oct. 1, 2020, Docket No. 35-2), continued to be sent to Emerson.  (2nd Emerson Decl. ¶ 4, Ex. 9, Oct. 1, 2020, Docket No 35-9.)  On March 14, 2020, Emerson alerted Eaton to this, and Eaton said that he would work on switching the AWS account over to Peakspeed.  (*See* George Decl. ¶ 6, Ex. E at 3, Oct. 8, 2020, Docket No. 48-5.)  On April 15, 2020, Zimmerman informed Emerson that the AWS account had been put in Peakspeed's name.  (George Decl. ¶ 8, Ex. G, Oct. 8, 2020, Docket No. 48-7.)  Amazon had previously issued $2,500 in free credits to the AWS account after Zimmerman and Emerson, as CTO of Peakspeed, had applied for them in late March.  (George Decl. ¶ 11, Ex. J at 2–4, Oct. 8, 2020, Docket No. 48-10.)

### 3. TrueView

At the time of Peakspeed's incorporation in January 2020, TrueView had reached various stages of development depending upon the specific platform on which it would run.  (2nd Emerson Decl., Ex. 10.)  Going forward, Emerson believed that TrueView only required the addition of one feature and some bug fixes.  (Emerson Tr. at 101:24–102:8.)

Kramer, on the other hand, thought that TrueView was not close to being a finished product at this time: the CPU host code was only in the early stages of development and the FPGA code had serious issues.  (2nd Kramer Decl. ¶¶ 41, 44.)  In particular, the FPGA code had four major imaging flaws and portions of the code that Emerson had written

needed to be better documented.  (Eaton Tr. at 243:9–245:11.)  The FPGA code consists of approximately 817 lines, of which Emerson wrote about 95%, and it constitutes about 10.6% of the total code.  (*See* 1st Decl. of Dave Eaton ("1st Eaton Decl.") ¶ 15, July 29, 2020, Docket No. 7.)

## C.  THE DISPUTE

Around May 2020, conflict began to grow between Emerson and Zimmerman, and Emerson thought he would eventually be pushed out of Peakspeed.  (1st Emerson Decl. ¶¶ 78–84.)  As a result, in late June, Emerson told Eaton that EmersonAI should be a research and development company independent from Peakspeed, and that Peakspeed could then sell products under an exclusive license from EmersonAI.  (*Id.* ¶¶ 85–86, 93.) Eaton was not happy with this idea.  (*Id.* ¶ 96.)  Emerson then either resigned on July 1, 2020, (1st Eaton Decl. ¶ 18), or was terminated on July 6, 2020, (1st Emerson Decl. ¶ 108, Ex. 12 at 2, Aug. 28, 2020, Docket No. 25-12.)

On July 3, 2020, Peakspeed's Microsoft DevOps account, used by the team for coding, signaled an alert that changes were being made to the TrueView source code, which was Emerson changing the copyright notices from Peakspeed to EmersonAI on 230 files, of which Emerson had worked on fifteen.  (1st Eaton Decl. ¶ 19.)  Around the same time, Emerson locked the coding team out of the AWS account.  (*Id.* ¶ 20.)  The AWS account retained roughly $1,500 of the $2,500 credit Amazon had issued in April 2020.

(Emerson Depo. at 153:21–154:5.)  Emerson also locked the team out of servers, owned by Emerson, that contained copies of the TrueView source code.  (1st Eaton Decl. ¶ 20.)

On July 8, 2020, Emerson applied to register the copyright for TrueView's source code, which was approved the following day by the United States Copyright Office.  (2nd Emerson Decl., Ex. 7, Oct. 1, 2020, Docket No. 35-7.)  He also registered the FPGA code itself, which he named Ortho Top.  (Emerson Depo. at 200:21–23, 205:6–19.)  On July 10, Emerson then sent letters to members of the Peakspeed team, warning them that TrueView was copyrighted material of EmersonAI and Emerson.  (*See, e.g.*, 1st Eaton Decl. ¶ 22, Ex. 2 at 2, July 29, 2020, Docket No. 7-2.)  On the same day, Emerson sent Eaton a litigation hold letter.  (1st Eaton Decl. ¶ 22, Ex. 3 at 2, July 29, 2020, Docket No. 7-3.)

Peakspeed opened a new AWS account, rented new servers, and rebuilt its development environment.  (1st Eaton Decl. ¶ 21.)  Peakspeed also rewrote portions of the source code that Emerson had written to avoid any copyright dispute, (*Id.*), and it continued to make significant changes to TrueView, as it was not yet a finished product by July 2020.  (2nd Kramer Decl. ¶¶ 42–44.)

Emerson informed Xilinx of the dispute regarding TrueView, and Xilinx notified Eaton that any dispute over TrueView could disrupt its relationship with Peakspeed.  (1st Eaton Decl. ¶¶ 23–24.)  Xilinx now refuses to fund Peakspeed's work until the current dispute is resolved.  (2nd Eaton Decl. ¶ 10.)  EmersonAI will likely go out of business if it cannot market TrueView.  (2nd Emerson Decl. ¶¶ 7–8.)

## II.  PROCEDURAL BACKGROUND

On July 24, 2020, Peakspeed filed its Complaint, alleging that it was the sole owner and exclusive user of the copyright to TrueView's source code[11] and that Emerson violated the Computer Fraud and Abuse Act ("CFAA") and converted Peakspeed property.  (Compl. ¶¶ 63–92.)  Peakspeed then filed a Motion for Preliminary Injunction, asking the Court to enjoin Emerson from claiming ownership of TrueView's source code, interfering with Peakspeed's use of it, and challenging Peakspeed's ownership of it; and, to order Emerson to restore Peakspeed's access to the AWS account and to destroy any copies of TrueView's source code in his possession.  (Mot. Prelim. Inj., July 29, 2020, Docket No. 5.)

On August 28, 2020, Emerson filed a Motion to Dismiss, asserting that the Court lacks personal jurisdiction over him.  (Mot. Dismiss, Aug. 28, 2020, Docket No. 21.)

## DISCUSSION

## I.  PERSONAL JURISDICTION

### A.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(2) provides that a party may move to dismiss claims for lack of personal jurisdiction.  "To defeat a motion to dismiss for lack of personal

---

[11] The Complaint alleges the same with respect to IdentifAI, another application begun by EmersonAI in 2019 and further developed by Peakspeed in 2020, (*see, e.g.*, Compl ¶ 1), but Peakspeed presently moves the Court only for relief with respect to the TrueView source code. Additionally, regarding personal jurisdiction, Peakspeed has not produced any evidence with respect to IdentifAI.  Accordingly, the Court will not consider any claims related to IdentifAI at this time.

jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." *Epps v. Stewart Info. Servs. Corp.,* 327 F.3d 642, 647 (8th Cir. 2003). "As long as there is 'some evidence upon which a prima facie showing of jurisdiction may be found to exist,' the Rule 12(b)(2) motion will be denied." *Pope v. Elabo GmbH,* 588 F. Supp. 2d 1008, 1014 (D. Minn. 2008) (quoting *Aaron Ferer & Sons Co. v. Diversified Metals Corp.,* 564 F.2d 1211, 1215 (8th Cir. 1977)). The party seeking to establish personal jurisdiction bears the burden of proof, and "the burden does not shift to the party challenging jurisdiction." *Epps,* 327 F.3d at 647. For purposes of a prima facie showing, the Court must view the evidence in the light most favorable to the non-moving party. *Westley v. Mann,* 896 F. Supp. 2d 775, 786 (D. Minn. 2012).

## B. DUE PROCESS AND SPECIFIC PERSONAL JURISDICTION

The Court may exercise personal jurisdiction over a defendant only if doing so (1) is consistent with Minnesota's long-arm statute, Minn. Stat. § 543.19, and (2) comports with the Due Process Clause of the Fourteenth Amendment. *Pope*, 588 F. Supp. 2d at 1014–15. Because Minnesota's long-arm statue extends as far as the Due Process Clause allows, "the Court need only consider whether exercising personal jurisdiction over [a defendant] is consistent with due process." *Id*. at 1015.

"The touchstone of the due-process analysis remains whether the defendant has sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Viasystems, Inc.*

*v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8ᵗʰ Cir. 2011) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).   Although personal jurisdiction can be general or specific, this action concerns only whether Emerson has sufficient minimum contacts to support specific jurisdiction.

For specific personal jurisdiction to be consistent with the Due Process Clause, the defendant must have purposefully created minimum contacts with the forum state itself and the litigation must arise out of those contacts.  *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014).   With these considerations in mind, the Eighth Circuit employs a five-factor personal jurisdiction test:

> (1) the nature and quality of the contacts with the forum state;
> (2) the quantity of the contacts with the forum state;
> (3) the relation of the cause of action to the contacts;
> (4) the interest of the forum state in providing a forum for its residents; and
> (5) the convenience of the parties.

*Bell Paper Box, Inc. v. Trans W. Polymers, Inc*., 53 F.3d 920, 922 (8ᵗʰ Cir. 1995) (citation omitted).   "The five-factor test essentially boils down to three: (1) whether the quality and quantity of the defendants contacts with the forum State establish minimum contacts; (2) whether the litigation arises out of those contacts; and finally, if the first two are met, (3) whether it is reasonable, considering the interest of the forum state and convenience to the parties, to force an out-of-state litigant to defend itself in the forum state."  *Ahlgren v. Muller*, 438 F. Supp. 3d 981, 987 (D. Minn. 2020).

C. **ANALYSIS**

The Court "must look at all the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination." *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).   Peakspeed argues that Emerson's actions, taken together, establish sufficient minimum contacts with Minnesota and that its claims arise out of these contacts.  The Court agrees.

First,  Emerson individually[12] entered into a contract with Xilinx in Peakspeed's name, touted TrueView to Amazon for free AWS credits doing the same, ratified the insertion of "Peakspeed" in place of "EmersonAI" in the source code's copyright header, and allowed Eaton to channel money through EmersonAI's bank account to pay Peakspeed's bills and salaries.  The Court finds that these actions were hardly random, fortuitous, or attenuated, but were deliberate promotions of business activity in Minnesota by Emerson. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

Moreover, Emerson verbally agreed to help establish Peakspeed so that it could further develop the source code and eventually market and sell TrueView.  He did so knowing that Peakspeed would conduct business in Minnesota.  As such, the Court finds that Emerson should have reasonably anticipated being haled into court in Minnesota

---

[12] Emerson contends that he never worked for or consulted Peakspeed, and that he only communicated with Eaton about the possibility of becoming Peakspeed's CTO, but this was never realized.

- 14 -

after allegedly thwarting Peakspeed's ability to market and sell TrueView there.  *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).

Further, because Peakspeed's claims sound in tort, the Court also looks to the *Calder* effects test.[13]  *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020); *see also Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991) (requiring the consideration of additional factors when an intentional tort is alleged).  Under the *Calder* test, a defendant's allegedly tortious conduct may create sufficient minimum contacts with the forum state if the plaintiff can make a prima facia showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state]."  *Johnson*, 614 F.3d at 796.

Given Emerson's awareness of Peakspeed's claim to TrueView, affirmed when he applauded the placement of "Peakspeed" in the copyright header of its source code, his registration of TrueView's copyright[14] was knowingly aimed at Peakspeed's competing

---

[13] *See, e.g.*, *Christie v. Nat'l Inst. for Newman Studies*, 258 F. Supp. 3d 494, 503 (D.N.J. 2017) (CFAA); *Janel Russell Designs, Inc. v. Mendelson & Assocs., Inc.*, 114 F. Supp. 2d 856, 862 (D. Minn. 2000) (copyright infringement).  Conversion is an intentional tort.  *Herrmann v. Fossum*, 270 N.W.2d 18, 20 (Minn. 1978).

[14] Emerson argues that EmersonAI registered the copyright, not Emerson; Peakspeed only names Emerson in the Complaint.  Moving forward, the Court agrees that Peakspeed should clarify whether its copyright claims relate only to Emerson or whether the Complaint should be amended to include EmersonAI.  At the prima facie stage, however, the required evidentiary showing is minimal, *see Johnson*, 614 F.3d at 794, and the Court finds that Peakspeed has met its burden here, especially as Emerson, himself, is named as possessing the rights and permissions of the copyright.

- 15 -

right.  Emerson also would have foreseen that Peakspeed's Minnesota business activities would be paralyzed as a result.

Similarly, given that Amazon extended $2,500[15] in free credits to the AWS account based upon Peakspeed's application, and that Emerson considered the account to be Peakspeed's before he departed, Emerson knowingly targeted Minnesota business by locking Peakspeed's coding team out of the AWS account and claiming the remaining credits.  Additionally, Emerson locked the team out of servers[16] and changed the copyright header of the source code that was stored on the DevOps platform, both of which were done to disrupt Peakspeed's Minnesota business so that Emerson could claim TrueView's source code as his own.  The Court finds that such conduct tethers Emerson to the forum in a meaningful way.  *See Walden*, 571 U.S. at 290.

Finally, the Court finds that Peakspeed's claims undoubtedly arise from Emerson's contacts with Minnesota.  Having found such a nexus, "it is presumptively not unreasonable to require [a defendant] to submit to the burdens of litigation in the

---

[15] In its Complaint, Peakspeed alleged that the remaining credits equaled $20,000.  After limited discovery, the actual amount was shown to be $2,500.  Peakspeed should accordingly amend the Complaint.

[16] Emerson owns the servers in question.  Peakspeed asserts that they were rented to host the source code, and that Emerson violated the CFAA by locking it out.  Considering the facts in the light most favorable to Peakspeed, *see Dakota Indus.*, 946 F.2d at 1391, while recognizing that the Court has "supplemental jurisdiction over all claims that . . . form part of the same case or controversy," *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 936 (D. Minn. 2019) (quoting 28 U.S.C. § 1367(a)), its CFAA claim survives for now.  The Court notes, however, that more evidence will likely be needed to survive challenges made at later stages of the proceedings.

forum," *Ahlgren*, 438 F. Supp. 3d at 988 (citing *Burger King*, 471 U.S. at 476), especially as Emerson sent a litigation hold letter to Peakspeed and cease-and-desist letters to its employees. Minnesota certainly has a significant interest in protecting a Minnesota company from potentially unfounded copyright infringement claims. *See Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 936 (D. Minn. 2019). As such, the inconvenience to Emerson would not be so burdensome as to violate traditional notions of fair play and substantial justice. Accordingly, the Court will deny Emerson's Motion to Dismiss.

## II. PRELIMINARY INJUNCTION

### A. STANDARD OF REVIEW

Courts evaluating a motion for preliminary injunctive relief weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019); *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

When applying the *Dataphase* factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed*

*Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999).  That said, "injunctive relief is an

extraordinary remedy and the movant has the burden of establishing the propriety of an

injunction."  *Watts v. Fed. Home Loan Mortg. Corp.*, No. 12-692, 2012 WL 1901304, at *3

(D. Minn. May 25, 2012).

### B. ANALYSIS

#### 1. Likelihood of Success on the Merits

Peakspeed must show that it has a "fair chance of prevailing" on the merits of at

least one its claims to satisfy the "likelihood of success on the merits" factor.[17]

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th

Cir. 2016) (quotation omitted).  A "fair chance" is less than a preponderance of the

evidence (i.e. greater than fifty percent chance of success), but more than an outside

chance of success.  *See Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th

Cir. 2003).

#### a. Copyright Claims

To succeed on a copyright claim, a movant must demonstrate a right to own the

copyright.  *See Pinkham v. Sara Lee,* 983 F.2d 824, 830 (8th Cir. 1992).  The Copyright Act

establishes that copyright ownership in a work "vests initially in the author or authors of

---

[17] The Court will only consider Peakspeed's copyright claims.  With respect to its conversion and CFAA claims, neither involve irreparable harm, as money damages offer adequate relief with respect to both.  As a result, the Court need not reach the remaining *Dataphase* factors with respect to these claims.  *See, e.g., Giombetti v. Wolf*, No. 20-873, 2020 WL 2319855, at *6 (D. Minn. May 11, 2020).

the work."  17 U.S.C. § 201(a).  "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  *But see* 17 U.S.C. § 102(b) ("[C]opyright protection [does not] extend to any idea, procedure, process, [or] system . . . embodied in such work.").

If there are joint authors, then they are co-owners of the copyright.  *See* 17 U.S.C. § 201(a); *see also* 1 M. Nimmer & D. Nimmer, Nimmer on Copyright §6.03 (2004) ("[E]ach contributor automatically acquires an undivided ownership in the entire work.")  A joint work is one prepared "with the intention that [contributions] be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.

"The Act carves out an important exception, however, for works made for hire."  *Reid*, 490 U.S. at 737 (quotation omitted).  "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author," 17 U.S.C. § 201(b), unless the person preparing the work is an independent contractor, *see Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir. 1999).  Indicia of independent contractor status include working from home, receiving irregular payments, being highly skilled, and, most definitively, the hiring party failing to extend benefits or pay social security taxes.  *Id.* at 1008–09.

**b. Analysis**

EmersonAI, and Emerson by extension, holds a certificate of registration for TrueView.  As such, Emerson is entitled to a rebuttable presumption that he is the author of TrueView.  *See Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1042 (8th Cir. 2003) (citing 17 U.S.C. § 410(c)).  Peakspeed argues that Emerson is neither the sole author of TrueView's source code, nor its joint author; or, in the alternative, that his work was done for hire, as an employee of Peakspeed.

The Court finds that neither Peakspeed nor Emerson is the sole author of the TrueView source code.  Though Peakspeed maintains that Emerson cannot be an author, claiming that his contributions are not copyrightable because they merely consisted of taking known trigonometric calculations and encoding them for FPGAs, Emerson has decades of experience in coding and coding often involves translating algorithms and calculations to achieve some functional expression.  Moreover, Eaton obviously thought Emerson was a key figure in developing the source code, for he put forward $35,000 to support EmersonAI and, ostensibly, named Emerson CTO of Peakspeed.  Most significant, both parties agree that Emerson wrote at least 95% of the FPGA code.  While it may only constitute around 10% of the total code, Emerson's successful registration of OrthoTop (the FPGA code itself) makes clear that his contributions were undoubtedly copyrightable.

However, given that 90% of the source code—the host processing code—was created by Kramer,[18] and that it is undisputed that TrueView requires both the FPGA code and the host processing code to work, Emerson cannot be the sole author of TrueView's source code either.  Instead, the source code is a joint work.  *See* 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into . . . interdependent parts of a unitary whole.").  Accordingly, the Court finds that Peakspeed and Emerson are likely joint authors of TrueView's source code.

Both parties attempt to skirt such a finding by asserting that the other's contributions were works for hire—specifically, Kramer's when consulting for EmersonAI in 2019, and Emerson's while with Peakspeed in 2020.  Both, however, run up against the same wall:  Kramer and Emerson worked from home, are highly skilled, and neither EmersonAI or Peakspeed extended benefits[19] or paid social security taxes on their behalf.  *See Kirk*, 188 F.3d at 1008–09.  Thus, in 2019 and 2020, respectively, Kramer and Emerson

---

[18] The rest of the coding team, Baldin, Greshik, and Losique, seem to have been more helpers than authors, as Kramer was solely responsible for translating the idea of the host processing code into a fixed, tangible expression.

[19] The Court notes that there is evidence indicating that Emerson was reimbursed by either Eaton or Peakspeed for health insurance payments that he individually paid; however, this is quite a different arrangement than an employee benefit plan.

were independent contractors, not employees.[20]   As such, Kramer and Emerson could have transferred their ownership interests in TrueView's copyright only by written conveyance.  *See Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992) (citing 17 U.S.C. § 204(a)).  No such writings exist.  Accordingly, the Court finds that Peakspeed is likely to succeed on the merits of its claim to have an undivided ownership in TrueView's source code as a joint author.

### 2.  Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  To succeed in demonstrating a threat of irreparable harm, mere possibility is not sufficient: the moving party "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief," *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quotation omitted)).  In copyright cases, the showing of a likelihood of success on the merits raises a presumption of irreparable harm.  *See Taylor Corp.*, 315 F.3d at 1041–42.

Peakspeed has shown a likelihood of success with respect to being a joint author, thus undivided owner, of the copyright to TrueView's source code.  Therefore, it is

---

[20] Though demonstrative rather than dispositive, Kramer also signed a service agreement expressly stating that he was an independent contractor.

entitled to a presumption of irreparable harm, which is not overcome here.  Given that Peakspeed is a start-up company, ascertaining any lost profits flowing from Emerson's interference with its right to own or use the source code would be extremely difficult to quantify.  Furthermore, Peakspeed has expended substantial sums of money to develop TrueView and it is now unable to market and sell it given this dispute, which constitutes great and imminent harm.  Finally, the harm is not merely speculative, for Peakspeed's deal with Xilinx is already in limbo and Xilinx will continue withholding payments until the copyright dispute is resolved.

As such, allowing any further interference with, or challenges to, Peakspeed's right to own and use TrueView would result in hard-to-ascertain and imminent losses, for which there would be no adequate remedy at law.  Accordingly, the Court finds that Peakspeed has shown a threat of irreparable harm.

### 3.  Balance of the Harms

The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued."  *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015). The Court finds that, absent injunctive relief, Peakspeed would suffer significant harm, for continued interference with and challenges to its right to own and use TrueView would continue to cripple its nascent business.

- 23 -

However, granting the other relief requested by Peakspeed—namely, enjoining Emerson from claiming ownership in the copyright and ordering him to destroy any copies of the source code—would cause significant harm to Emerson, for he would be prevented from asserting his own rights as a joint author.[21]   Accordingly, the Court finds that the balance of the harms favors enjoining Emerson only from interfering with and calling into question Peakspeed's joint ownership and use of TrueView's source code.

### 4.  Public Interest

The public interest is furthered by enforcing copyright laws.  *Control Data Sys., Inc. v. Infoware, Inc.*, 903 F. Supp. 1316, 1326 (D. Minn. 1995).  The public also has a strong interest in protecting vigorous but fair business competition.  *Katch*, 143 F. Supp. 3d at 876.   Here, given that the parties are likely joint authors, enjoining Emerson from interfering with and calling into question Peakspeed's joint ownership and use of TrueViews's source code would further both the enforcement of copyright laws and the promotion of vigorous but fair business competition.  Accordingly, the Court finds that the public interest weighs in favor of injunctive relief.

### C.  CONCLUSION

In sum, the Court finds that Peakspeed has met the *Dataphase* factors with respect to being a joint author of TrueView's source code.  Accordingly, the Court will grant

---

[21] Peakspeed also asks the Court to order Emerson to restore its access to the AWS account. However, as mentioned above, *supra* n.17, damages would offer adequate relief, so Peakspeed would not suffer harm in the absence of injunctive relief with respect to this claim.

Peakspeed's Motion for Preliminary Injunction, in part, and enjoin Emerson from interfering with or calling into question Peakspeed's joint right to own and use TrueView's source code.  The Court will deny the Motion in all other respects.  As Peakspeed is a start-up company and the value of the source code is extremely hard to quantify, as TrueView is not yet a final product, the Court finds that a $10,000 bond will constitute sufficient security to satisfy Rule of Civil Procedure 65(c).

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Docket No. 21] is **DENIED**.

2. Plaintiff's Motion for Preliminary Injunction [Docket No. 5] is **GRANTED in part and DENIED in part** as follows:

    a. Emerson must not interfere with Peakspeed's use of TrueView's source code.

    b. Emerson must not contact Peakspeed's employees, customers, or partners to call into question Peakspeed's ownership of TrueView's source code.

    c. All other requested relief is denied.

    d. Pursuant to Rule of Civil Procedure 65(c), Peakspeed must post a $10,000 bond.

3. This Preliminary Injunction is effective upon the posting of the required bond.

DATED:  December 29, 2020
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court